83 F.3d 1266
 UNITED STATES of America, Plaintiff-Appellee,
v.
Tracy Dinah IVY, aka Tracy Norwood, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Samuel Earl NORWOOD, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Joye Collette TRAYLOR, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Raymond Howard HICKMAN, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Kenny TAYLOR, aka K-Dawg, Defendant-Appellant.
 Nos. 94-6131 to 94-6133, 94-6136 and 94-6137.
 United States Court of Appeals,
Tenth Circuit.
 May 10, 1996.
 
 Nos. 94-6136 and 94-6137 submitted on the briefs.*
 Leslie M. Maye, Assistant United States Attorney (Patrick M. Ryan, United States Attorney, with her on the brief), Oklahoma City, Oklahoma, for Plaintiff-Appellant.
 Jill M. Wichlens, Assistant Federal Public Defender (Michael G. Katz, Federal Public Defender, with her on the briefs), Denver, Colorado, for Defendant-Appellant Tracy Dinah Ivy.
 David M. Dunlap (David Lynn on the brief), Oklahoma City, Oklahoma, for Defendant-Appellant Samuel Earl Norwood.
 David M. Dunlap, Oklahoma City, Oklahoma, for Defendant-Appellant Joye Collette Traylor.
 Thomas D. McCormick, Oklahoma City, Oklahoma, for Defendant-Appellant Raymond Howard Hickman.
 Kenneth Watson, Oklahoma City, Oklahoma, for Defendant-Appellant Kenny Taylor.
 Before BRORBY, McKAY and ALARCON,** Circuit Judges.
 BRORBY, Circuit Judge.
 
 
 1
 A jury convicted Tracy Dinah Ivy, Samuel Earl Norwood, Joye Collette Traylor, Raymond Howard Hickman, and Kenny Taylor of one count of conspiracy "to possess with intent to distribute and to distribute cocaine powder and/or cocaine base (crack)" in violation of 21 U.S.C. §§ 841(a)(1) and 846, and convicted Ms. Ivy of four counts, Mr. Norwood of seven counts, Ms. Traylor of nine counts, and Mr. Hickman and Mr. Taylor of three counts of distribution of cocaine base in violation of 21 U.S.C. § 841(a)(1). It also convicted Mr. Norwood and Ms. Traylor of two counts and Mr. Hickman of one count of distribution of cocaine to persons under age twenty-one in violation of 21 U.S.C. § 859, convicted Mr. Norwood and Mr. Hickman of three counts of possession with intent to distribute cocaine base in violation of 21 U.S.C. § 841(a)(1), and convicted Mr. Norwood of two counts of interstate travel in aid of racketeering in violation of 18 U.S.C. § 1952(a)(3) and two counts of aiding and abetting distribution of cocaine base in violation of 18 U.S.C. § 2 and 21 U.S.C. § 841(a)(1).
 
 
 2
 The district court sentenced Mr. Norwood and Mr. Hickman each to an aggregate sentence of life imprisonment. Ms. Ivy received an aggregate sentence of thirty years, Ms. Traylor received an aggregate sentence of twenty-seven years, and Mr. Taylor received an aggregate sentence of twenty-one years, ten months.
 
 
 3
 In this consolidated appeal, Ms. Ivy, Mr. Norwood, Ms. Traylor, Mr. Hickman, and Mr. Taylor challenge their convictions, and all except Mr. Taylor challenge their sentences. We exercise jurisdiction pursuant to 18 U.S.C. § 3742(a) and 28 U.S.C. 1291, remand Ms. Ivy's and Mr. Hickman's cases for resentencing in accordance with this opinion, and affirm the defendants' convictions and sentences in all other respects.
 
 I. Factual and Procedural Background
 
 4
 This case is the result of a five-year investigation by federal and local law enforcement officers. The investigation uncovered a large-scale conspiracy to distribute crack cocaine in the Kerr Village area of Oklahoma City. Mr. Norwood was the leader of the conspiracy, and Ms. Ivy, Ms. Traylor, and Mr. Hickman acted as intermediaries, shuttling drugs and cash between Mr. Norwood and the many street dealers he supplied, including Mr. Taylor, Mr. Chitwood, Leroy Washington, Nathaniel Washington, Moty Davis, Nigel Clay, Flora Ingram, and Richard Ingram. What follows is a rough chronology of the Norwood/Hickman conspiracy, describing the involvement of the many players who passed in and out of it until its downfall in 1993.
 
 A. The Street Dealers
 
 5
 The story of this conspiracy begins in the summer of 1988. One of Mr. Norwood's 1988 suppliers, Larry Hornsby, testified he fronted Mr. Norwood between one-half and one ounce of crack cocaine about twice per week for approximately two months. Mr. Hornsby was arrested in October 1988 on federal drug charges, but was released after six days. After he was released, their roles reversed, and Mr. Hornsby began purchasing cocaine from Mr. Norwood, who in turn got the cocaine from a supplier in California. Mr. Hornsby gave Mr. Norwood $1,500 to purchase one and one-half ounces of cocaine powder from his California supplier, which Mr. Hornsby later cooked into crack cocaine. Mr. Norwood personally drove to California and retrieved the cocaine. Mr. Hornsby continued to purchase cocaine from Mr. Norwood during the six to eight months following his release in October 1988. He made two or three purchases of one or one and one-half ounces of cocaine powder. Mr. Norwood showed Mr. Hornsby one-quarter to one-half kilogram of cocaine in Mr. Norwood's apartment in January 1989. Mr. Hornsby also saw a safe with money in it. On one occasion, Mr. Norwood had a woman he was living with at the time, Priscilla Meadows, deliver two ounces of cocaine powder to Mr. Hornsby. According to Mr. Hornsby, Mr. Norwood also had Ms. Ivy help him distribute crack cocaine, and there was "no doubt about it that she was part of his business." Mr. Norwood was distributing cocaine to a number of other individuals for resale during this time, including Audrey Holmes.
 
 
 6
 Orville Nelson testified that in summer 1989, when he was sixteen years old, he and Mr. Norwood's cousin used to steal items and sell them to Mr. Norwood. One day that summer, Mr. Norwood's cousin and Orville Nelson saw Mr. Norwood drive by, waved him down, got into his car, and drove toward the apartment Mr. Norwood was living in at the time. While they were in the car, Mr. Norwood showed Orville Nelson a large diamond ring he was wearing and said that to be rich like him, "what you all need to do is, you know, sell some dope for me." Mr. Norwood then fronted Orville Nelson seven grams of crack cocaine. Orville Nelson agreed to sell the crack cocaine for $500 and return $250 to Mr. Norwood. Mr. Norwood's cousin taught Orville Nelson how to divide up the cocaine with a razor and sell it on the street. It took Orville Nelson one week to sell the seven grams of crack cocaine. Mr. Norwood supplied Orville Nelson with approximately seven grams of crack cocaine per week for two and one-half months. Thereafter, Mr. Norwood stopped handling the crack cocaine he supplied to Orville Nelson, and had Ms. Ivy deliver it to him instead. However, Orville Nelson continued to give the money to Mr. Norwood. Ms. Ivy delivered seven gram packets of crack cocaine to Orville Nelson between five and ten times. Orville Nelson stopped selling crack cocaine in December 1989. In May 1993, Orville Nelson started selling crack cocaine he received from Richard Ingram, who in turn received his supplies from a man named Lawrence. Orville Nelson also saw Mr. Taylor selling crack cocaine in Kerr Village, and once in June 1993 bought one-half ounce of crack cocaine from him and resold it.
 
 
 7
 Richard Ingram, began selling crack cocaine in March 1990, when he was fifteen years old. In this first transaction, Mr. Hickman fronted him four or five grams of crack cocaine. For the next five or six months, Mr. Ingram sold approximate one-quarter ounce of crack cocaine every two days, all supplied by Mr. Hickman. Mr. Hickman was also supplying Nathaniel Washington and an individual named Rodney at that time. Mr. Hickman's brother, Mr. Norwood, was his supplier. During the seven or eight months following September 1990, Mr. Ingram sold crack cocaine off and on. During the four or five months following August 1991, Mr. Ingram sold five or six half-ounce quantities of crack cocaine he received from his sole supplier, Mr. Hickman, who in turn received his supply from Mr. Norwood. Mr. Ingram continued to sell about one ounce of crack cocaine per month throughout 1992, again from his sole supplier Mr. Hickman. On one occasion in 1992, Mr. Ingram saw Ms. Traylor deliver crack cocaine to Mr. Hickman. Mr. Ingram got crack cocaine from a person named Lawrence in February to September 1993, and stopped buying crack cocaine from Mr. Hickman and Mr. Norwood, except for three occasions when Lawrence ran out of crack cocaine. Ms. Traylor participated in all three transactions. Mr. Ingram sold one-half ounce of crack cocaine to Mr. Taylor in September 1993, and saw him sell crack cocaine in August 1993.
 
 
 8
 Lee Roy Washington testified he began selling crack cocaine in August 1991, when he was twenty-one years old. He explained he did not need anyone to introduce him to the crack cocaine business because he "knew what to do. Right there on TV, it was obvious to everybody." Ms. Ingram introduced Mr. Washington to Mr. Hickman, and Mr. Hickman sold him a sixteenth of an ounce of crack cocaine. Starting around August 1992, Mr. Washington also got crack cocaine from Mr. Norwood, but not directly, because Ms. Ivy made the deliveries. Mr. Norwood, through Ms. Ivy, supplied Mr. Washington with one-half ounce quantities of crack cocaine on two occasions, and one ounce quantities on two or three occasions. Ms. Traylor also delivered one-half ounce quantities to Mr. Washington once or twice. Mr. Washington delivered the money directly to Mr. Norwood once or twice.
 
 
 9
 Moty Reed Davis testified he began selling crack cocaine in 1991 at age sixteen. Mr. Davis saw Mr. Taylor sell crack cocaine in late 1991 or early 1992. Mr. Taylor and Mr. Davis lived together in late 1992. During that time, Mr. Taylor told Mr. Davis he could get crack cocaine from Mr. Hickman or Richard Ingram. Mr. Davis purchased one-quarter and one-half ounce quantities from Mr. Hickman on three or four occasions. Mr. Davis left Oklahoma City for a while, but returned in April 1993. He began stealing cars to raise enough money to start selling crack cocaine again. Mr. Davis had raised enough money by May 1993 and bought one ounce of crack cocaine from Mr. Hickman. Mr. Davis bought crack cocaine from Mr. Hickman two more times that summer. He also saw Mr. Taylor buy one-half ounce and one ounce quantities of crack cocaine from Mr. Hickman three or four times. Mr. Davis also lent Mr. Taylor his digital scale so he could check the weight of the crack he was buying. Mr. Davis also purchased one ounce of the gasoline crack from Mr. Hickman in the summer of 1993.
 
 
 10
 Marcus Fuller testified he began selling crack cocaine in January 1992. In September 1992, an individual whose street name was Kid Ice told Mr. Fuller that Mr. Hickman could supply him with crack cocaine. Mr. Fuller and Kid Ice went to Mr. Hickman's house and they each purchased onehalf ounce of crack cocaine from him. The next day Kid Ice and Mr. Fuller went to Mr. Hickman's house again and they each bought another one-half ounce of crack cocaine from him. In early 1993, Mr. Fuller saw Mr. Hickman driving by, flagged him down, and bought another one-half ounce of crack cocaine from him. In May 1993, Mr. Fuller and his half brother Ron Harris bought crack cocaine from Mr. Hickman twice in one day. Mr. Fuller purchased a total of fourteen grams and Mr. Harris purchased one-sixteenth of an ounce. Mr. Harris was killed in a drug deal later that year. Mr. Fuller also purchased one-half ounce of crack cocaine from Ms. Ivy in April or May 1993. Two or three weeks later, Mr. Fuller bought another five grams of crack cocaine from Ms. Ivy.
 
 
 11
 Nigel Clay began selling crack cocaine supplied by Mr. Hickman in May 1993. Between May 1993 and September 1993, Mr. Hickman supplied up to one-half ounce of crack cocaine to Mr. Clay six or seven times. Mr. Clay saw Mr. Hickman get crack cocaine from his brother Mr. Norwood on more than one occasion while Mr. Norwood was sitting in his car. The quantities ranged from one to three ounces. A couple of times there was an unidentified woman with Mr. Norwood in the car. Mr. Clay also received some of what was referred to as "gasoline crack" in June 1993.
 
 B. The Colombian Connection
 
 12
 Brent Smiley testified he began selling crack cocaine in 1988, when he was eighteen years old. Mr. Smiley got some of his supply from Teresa Griffin in Houston, Texas. Ms. Griffin initially supplied Mr. Smiley with five ounces of crack cocaine at a time, but that amount later increased to quarter-kilograms, half-kilograms and whole kilograms. In September 1991, while Ms. Griffin was in Oklahoma City, Mr. Smiley gave her phone number to Frank Petties, who called her and arranged a meeting between Ms. Griffin and Mr. Norwood. Mr. Smiley made the introduction because he knew Mr. Norwood wanted to buy one-half kilogram of cocaine. Mr. Norwood contacted Ms. Griffin. Ms. Griffin was arrested in October 1991. In November or December 1991, Mr. Norwood told Mr. Smiley he had bought some "fake dope," and he needed "nine ounces, half a kilo, whatever he could get." Mr. Smiley said he "would talk with the Colombians" in Houston "and see what they can do." A Mr. Lopez "sent another Colombian" from Houston to Oklahoma City to retrieve some drugs belonging to Carlos Gonzalez, who had recently been arrested, and Mr. Smiley bought nine ounces of Mr. Gonzalez's cocaine. Mr. Smiley did not sell any of this cocaine to Mr. Norwood.
 
 
 13
 In January 1992, Mr. Smiley began making trips to Houston to pick up cocaine powder. On February 17, 1992, three days before his twenty-second birthday, Mr. Smiley drove to Houston with Timmy Holloway, William Anthony Tingle, and Robin Johnson, and approximately $45,000 in cash to purchase cocaine. Mr. Smiley returned with a kilogram of cocaine powder, cooked it into crack, and telephoned Mr. Norwood to tell him he had nine ounces for him. When Mr. Norwood drove up to get the crack cocaine, he was in the driver seat, and Mr. Smiley handed it to a woman in the passenger seat. Mr. Smiley later went to Mr. Norwood's house and picked up the $6,500 Mr. Norwood owed for the crack cocaine from an unidentified young woman. Mr. Smiley made another trip to Houston in March 1992. Before he left, Mr. Smiley told Mr. Norwood he thought he could get him one-half kilogram of cocaine. Mr. Smiley was unable to get the one-half kilogram, but supplied Mr. Norwood with another nine ounces of crack cocaine. Mr. Smiley delivered the crack cocaine to the same young woman at Mr. Norwood's house. Mr. Norwood personally gave Mr. Smiley $6500 for the crack cocaine a few days later. When he handed Mr. Smiley the money, Mr. Norwood said he needed more crack cocaine because he was going out of town soon. Mr. Smiley later sold him five ounces of crack cocaine. Mr. Smiley then made a third trip to Houston in March 1992, and brought Mr. Norwood's girlfriend Audrey Holmes. Mr. Smiley brought $34,000 in cash, and purchased one and one-half kilograms of cocaine powder from the Colombians in Houston. One-half kilogram was for Mr. Norwood. Mr. Smiley cooked the cocaine when he returned to Oklahoma City and gave Ms. Holmes eighteen ounces of crack cocaine to bring to Mr. Norwood. At Mr. Norwood's request, Mr. Smiley went to his house and picked up the $12,000 Mr. Norwood owed for the crack cocaine from an unidentified young woman. Mr. Smiley was arrested in April 1992 and has remained in custody ever since. By that time, he had made approximately ten trips from Oklahoma City to Houston to purchase cocaine from the Colombians. Ms. Holmes later delivered five ounces of crack cocaine to Mr. Smiley's brother Charles, of which two and one-half ounces was intended to settle the remainder of Mr. Norwood's debt, and two and one-half ounces were intended as a front to Charles Smiley. Charles Smiley was supposed to pay Ms. Holmes the money he owed Mr. Norwood for the fronted crack cocaine after he sold it. Charles Smiley later explained that Mr. Norwood always used to "have one of his females" deliver drugs for him.
 
 C. Flora Ingram
 
 14
 Richard Ingram's sister, Flora Ingram, provided the most damning testimony against the members of the Norwood/Hickman conspiracy. She testified she began selling crack cocaine in January 1990, shortly after she turned seventeen. In February 1990, she began getting her supply from Mr. Norwood. In the first transaction, Mr. Norwood had his little brother, Mr. Hickman, deliver one-sixteenth of an ounce of crack cocaine to Ms. Ingram. Ms. Ivy was with Mr. Norwood when Ms. Ingram first contacted him, but there is no indication she participated in the transaction. At that time, Mr. Norwood also had a relationship with Ms. Traylor and stored crack cocaine at her apartment. After she sold the first sixteenth of an ounce, Ms. Ingram continued to sell crack cocaine supplied by Mr. Norwood through Mr. Hickman until August or September 1990. Ms. Ivy also made one delivery of one-sixteenth of an ounce of crack cocaine to Ms. Ingram Between January and April 1990, Ms. Ingram and Mr. Hickman worked together to sell three or four ounces of crack cocaine per day, at a profit of $4,000 per day. Mr. Norwood supplied almost all of the crack cocaine they sold, and Mr. Hickman delivered the money either to Mr. Norwood or Ms. Ivy. Ms. Ingram saw Ms. Ivy deal crack cocaine supplied by Mr. Norwood on at least four occasions.
 
 
 15
 Between May and July 1990, Ms. Ingram and Mr. Hickman lived with Mr. Norwood and Ms. Ivy and continued to sell crack cocaine supplied by Mr. Norwood. During this time, Ms. Ingram saw Mr. Norwood cook crack cocaine twice. She also learned Mr. Norwood stored crack cocaine in his backyard, in a shed, and in a tree. On one occasion, Mr. Norwood cooked six or seven ounces of cocaine Ms. Ivy had obtained and Ms. Ivy, Mr. Hickman, and Ms. Ingram sold it. Between late August and October 1990, Ms. Ingram and Mr. Hickman worked together to sell one ounce of crack cocaine per day. Between October 1990 and January 1991, Ms. Ingram sold crack cocaine only once, and instead supported herself by stealing clothing. Mr. Hickman continued to sell crack cocaine during this time, but he got the cocaine from an individual named Peedy, because Mr. Norwood had run out. Ms. Ingram bought one-half ounce of crack cocaine from Mr. Norwood in February 1991. Mr. Norwood began supplying Mr. Hickman with one or two ounces of crack cocaine per day starting in March or April 1991. In May 1991, Ms. Ingram resumed selling approximately one ounce of crack cocaine per day, supplied by Mr. Norwood.
 
 
 16
 Ms. Ingram testified Charles McCloud was supplying Mr. Norwood with crack cocaine during the late summer or early fall of 1991 from California, and that Audrey Holmes and Ms. Ivy went to California once that summer to get eighteen ounces of cocaine from Mr. McCloud and bring it back to Mr. Norwood in Oklahoma City. Ms. Ingram and Mr. Hickman sold nine ounces of crack cocaine out of that shipment. Mr. McCloud also sent Mr. Norwood another shipment of three kilograms of cocaine, and Ms. Ingram and Mr. Hickman distributed half of that shipment as well. Mr. Norwood also purchased nine ounces of cocaine powder from a person named Roy, cooked it at Ms. Traylor's house, and gave Ms. Ingram and Mr. Hickman half to distribute. Ms. Traylor helped weigh the crack cocaine. Two weeks later, Mr. Norwood purchased another eighteen ounces of cocaine powder from Roy, cooked it at Ms. Ivy's house, and gave Ms. Ingram and Mr. Hickman half to sell. Ms. Ivy and Mr. Hickman weighed and bagged the crack cocaine.
 
 
 17
 Ms. Ingram gave birth to a son in September 1991, but continued to sell crack cocaine. Between September and December 1991, Ms. Traylor delivered crack cocaine to Ms. Ingram twice, once one-half ounce and the other one and one-half ounces. During this period, Nathaniel Washington and Richard Ingram were also selling crack cocaine for Sam Norwood. Ms. Ingram moved to a new house in Kerr Village in November 1991, but continued to sell crack cocaine with Mr. Hickman. Between November 1991 and March 1992, Ms. Ingram got most of her crack cocaine from Ken Roselle, but she did receive one-half ounce from Mr. Norwood in February 1992. The day Ms. Ingram picked up the crack cocaine from Mr. Norwood's house, he was planning a trip to Dallas. Ms. Ivy also delivered two ounces of crack cocaine to Mr. Hickman in March or April 1992. Mr. Hickman and Ms. Ingram continued to sell crack cocaine, mostly obtained from a source other than Mr. Norwood, until June 1992, when she went to jail for larceny. Ms. Ingram was released in November 1992, and began selling crack cocaine again three months later. During those three months, Ms. Ingram lived with Mr. Hickman, and he and Ms. Ivy were selling crack cocaine for Mr. Norwood.
 
 
 18
 In June 1993, Mr. Norwood was getting his supply from a man named Ken. Ms. Ingram saw Ken at Mr. Norwood's house on at least one occasion. The cocaine Ken supplied tasted like gasoline, and was sometimes referred to during trial as the "gasoline crack." Ms. Ingram, Mr. Hickman, and Nathaniel Washington distributed the gasoline crack for Mr. Norwood during this period. Mr. Hickman redistributed one-half and one ounce quantities of the gasoline crack to Mr. Chitwood, and individuals with the street names Bullet, Moe, and Snook. Mr. Hickman also distributed one-half ounce of crack cocaine to Mr. Taylor, and Ms. Ingram saw another one-half ounce of crack cocaine divided into sixteenth-ounce packets at Mr. Taylor's house. Mr. Taylor sold one of the sixteenth-ounce packets while Ms. Ingram was at his house.
 
 
 19
 D. The Investigation and the Controlled Buys
 
 
 20
 FBI Special Agent John Hersley interviewed Ms. Ivy on January 11 and 14, 1993. Ms. Ivy told him she lived with Mr. Norwood at one of his two residences, 3113 Southwest 72nd Street, and had two children by him. She also said that Audrey Holmes, "another one of Sam Norwood's girlfriends," was involved in transporting crack cocaine from California to Oklahoma City to supply Mr. Norwood. His investigation also revealed that Mr. Norwood had Ms. Holmes and his other "lady friends," including Ms. Ivy and Ms. Traylor, sell crack cocaine for him so he would not "be linked up directly with the cocaine." In December 1992, Ms. Holmes, Mr. McCloud, and three other individuals brought between one-half and one kilo of crack cocaine from California to Oklahoma City in a green van. Agent Hersley learned from another informant that Mr. Norwood had arranged the transaction and had directed Ms. Holmes to retrieve the crack cocaine from Mr. McCloud. Ms. Ivy later saw two ounces of the crack cocaine in Ms. Holmes' kitchen. Ms. Ivy told Agent Hersley, and Ms. Ingram testified during trial, that the police arrested Ms. Holmes before she had distributed all of the crack she had brought from California. The arrest scared Mr. Norwood because he was afraid Ms. Holmes would turn him in to the police. At the time they arrested Ms. Holmes, the police served search warrants on both Ms. Holmes' and Ms. Ivy's residences and discovered crack cocaine in both locations. Ms. Ivy later admitted the eighth-ounce of crack cocaine found in her residence was hers. She stated Ms. Holmes had introduced her to an associate of Mr. McCloud in Oklahoma City, and that Mr. McCloud's associate fronted her one-half ounce of crack cocaine, worth $500, for $200. The eighth-ounce found in her residence was the portion of the original half-ounce she had not yet distributed. Ms. Ivy intended to use the money she received selling the half-ounce of crack cocaine to purchase part of the crack cocaine Ms. Holmes and Mr. McCloud brought from California. During his investigation, Agent Hersley also discovered Ms. Ivy helped reweigh and repackage crack cocaine for Mr. Norwood. Ms. Ingram testified that Mr. Norwood began selling crack cocaine again in large quantities in June 1993, after Ms. Holmes was sentenced.
 
 
 21
 On July 30, 1993, Agent Hersley arranged for Ms. Ingram's sister, Angela England, to make a controlled buy from Mr. Hickman in the Kerr Village area of Oklahoma City. Agent Hersley gave Ms. England a tape recorder and $300 to make the purchase. When Ms. England returned, she gave Agent Hersley one-quarter ounce of crack cocaine and said she had purchased it from Mr. Hickman. Ms. England also gave Agent Hersley a the tape recording of the transaction, but it was essentially unintelligible. Ms. England made another controlled buy from Mr. Hickman on August 4, 1993. This time Ms. England carried a transmitter, and Agent Hersley was able to monitor her conversation with Mr. Hickman. She purchased one-half ounce of crack cocaine from Mr. Hickman for $500. Mr. Hickman went around the corner to pick up the crack cocaine at Kenny Taylor's house. Ms. England made a third controlled buy from Mr. Hickman on August 16, 1993, and again carried a recorder and transmitter. Mr. Hickman sold her one-half ounce of crack cocaine for $500, and three-sixteenths of an ounce for $100.
 
 
 22
 On August 20, 1993, a few days after Ms. England's third controlled buy, Ms. Ingram telephoned Agent Hersley and told him Mr. Hickman was at Ms. Traylor's and Mr. Norwood's house at 2321 South Kate Avenue to pick up two ounces of crack cocaine. Agent Hersley and other law enforcement officers went to Mr. Norwood's Kate Avenue house and saw Mr. Hickman's car parked in the driveway. The officers left Mr. Norwood's house for a short time, and when they returned Mr. Hickman's car was gone. Officers spotted Mr. Hickman's car parked in front of a residence in Kerr Village. When Agent Hersley arrived, Mr. Hickman had been placed under arrest. Officers found $950 in cash and two ounces of crack cocaine inside the residence. The cash was in a toolbox belonging to the owner of the house, Mr. Burris, a man in his late seventies whom Mr. Hickman and his brother Mr. Norwood affectionately referred to as "grandpa." Mr. Burris testified the cash belonged to Mr. Hickman. The crack cocaine had been stuffed under a cushion of a couch inside the residence. Before the police came, Mr. Hickman had sat down on the couch to watch television. He had only been there two or three minutes and not been anywhere else in the house. The crack cocaine was wrapped in a blue paper towel. Agent Hersley found an identical roll of blue paper towels inside Mr. Hickman's car. Ms. Ingram testified Mr. Hickman used to wrap crack cocaine in a blue napkin when he carried it in his car. Mr. Burris testified the crack cocaine belonged to Mr. Hickman. There were no blue paper towels in the residence, other than the one used to wrap the crack cocaine. The officers took Mr. Hickman to the Oklahoma City Police station and gave him a Miranda[1] warning. After Mr. Hickman waived his rights, Agent Hersley and two other officers interviewed him for approximately thirty minutes. Mr. Hickman admitted the car was his and that he had been inside the residence, but stated he did not know anything about the cash and crack cocaine found inside.
 
 
 23
 On August 25, 1993, a few days after Mr. Hickman's arrest, Ms. Ingram made a controlled buy from Mr. Norwood. While wearing a recorder and transmitter, she entered Mr. Norwood's Kate Avenue house, gave him $900, and received two ounces of crack cocaine. The usual price for two ounces of crack cocaine is $2000, but Agent Hersley wanted to see if Mr. Norwood would front two ounces of cocaine to Ms. Ingram with the promise she would pay him after she sold it. Ms. Traylor, who also resided at the Kate Street house, retrieved the crack cocaine from its hiding place on Mr. Norwood's orders. Vivian Henderson also lived at the Kate Street house, but was not present. Ms. Henderson used to work as a prostitute to earn money to buy crack cocaine from Ms. Traylor. Mr. Norwood told Ms. Ingram to remind her brother Richard Ingram he owed Mr. Norwood $400 for crack cocaine. Ms. Ingram made a second controlled buy on August 26, 1993, at Mr. Norwood's Kate Avenue house. She paid Mr. Norwood the $1,100 she owed him and Mr. Norwood fronted her one ounce of crack cocaine, worth $1,000, for only $500. Ms. Traylor and Mr. Chitwood were present during the transaction. Mr. Norwood again had Ms. Traylor retrieve the crack cocaine for Ms. Ingram and told Ms. Ingram he was down to his last ounce and one-half. On August 27, 1993, Ms. Ingram telephoned Mr. Norwood from an FBI office and asked if he had any crack cocaine, and Mr. Norwood responded "Not yet." The FBI recorded their telephone conversation. On August 28, 1993, Ms. Ingram made a third controlled buy from Mr. Norwood at his Kate Avenue house. Ms. Ingram paid Mr. Norwood the $500 she owed him and offered to give him another $500 if he would front her one ounce, or $1000 worth, of crack cocaine. Mr. Norwood agreed and had Ms. Traylor retrieve an ounce of crack cocaine for Ms. Ingram. Ms. Traylor drove to another location in Mr. Norwood's car and returned five minutes later with the crack cocaine. Ms. Ingram later told the FBI Mr. Hickman was responsible for distributing more than twenty kilograms of crack cocaine since early 1990. Ms. Ingram's uncle, Billie England, testified he saw Mr. Hickman supply Ms. Ingram with one-half ounce quantities of crack cocaine "[m]ore [times] than I can count," and when asked how many times Mr. Norwood provided one-half ounce or more of crack cocaine to Ms. Ingram and Mr. Hickman, Mr. England responded "[m]ore than I can count." Mr. England used to help Ms. Ingram, Mr. Hickman, Mr. Taylor, Mr. Chitwood, Moty Davis, Nathaniel Washington, and individuals with the street names Yellow and Bullet get smokers to buy from them in exchange for crack cocaine to feed his habit. Mr. England also confirmed testimony from other witnesses that Ms. Ivy and Ms. Traylor used to collect drug money for Mr. Norwood.
 
 
 24
 FBI Special Agent Matt Lottspeich and other law enforcement officers executed a search warrant on the Kate Street house and arrested Ms. Henderson and Ms. Ingram on the evening of August 28, 1993. The officers arrested Ms. Traylor later that evening. The officers found $1000 in cash and 10.5 grams of crack cocaine in Ms. Traylor's bedroom. They arrested Mr. Norwood on August 29, 1993. During an interview on the day of his arrest, Mr. Norwood told Agent Hersley he was not dealing in crack cocaine at that time, but that Agent Hersley "should have gotten him back in 1988 when he was really going good." On November 13, 1993, FBI Special Agent Walter Lamar arrested Mr. Taylor at his home. He searched Mr. Taylor, but did not find any drugs on his person. Agent Lamar did not search Mr. Taylor's house. During an interview later that day, Mr. Taylor admitted he had purchased crack cocaine.
 
 E. The Prosecution
 
 25
 On January 4, 1993, a grand jury returned a forty-five-count indictment against Ms. Ivy, Mr. Norwood, Ms. Traylor, Mr. Hickman, Mr. Taylor, Christopher Don Chitwood, Kelly Dwain Brannon, Lee Roy Washington, and Leon Lamont Nelson. Mr. Brannon, Mr. Washington, and Leon Nelson entered guilty pleas, and we have since affirmed Mr. Washington's and Mr. Nelson's convictions and sentences. United States v. Nelson, No. 94-6105, 1995 WL 48057 (10th Cir. Feb. 7, 1995); United States v. Washington, No. 94-6104, 1995 WL 50051 (10th Cir. Feb. 8, 1995),. The six remaining defendants were tried together, and the jury found them guilty as charged on all counts. We have affirmed Mr. Chitwood's conviction and sentence in a separate appeal. United States v. Chitwood, No. 94-6142, 1995 WL 216900 (10th Cir. Apr. 12, 1995).[2]II. Guilt Issues
 
 A. Discovery Violation
 
 26
 On the day Ms. Ivy was arraigned, November 5, 1993, the district court issued a discovery order directing the United States Attorney to meet and confer with Ms. Ivy's attorney, and, upon the request of Ms. Ivy's attorney, to do the following:
 
 
 27
 (b) Provide defendant's attorney with the substance of an oral statement made by the defendant in response to any interrogation by an employee or agent of any governmental agency, local, state or federal, involved in the investigation or reporting of the offense(s) charged in the Indictment, whether or not reduced to writing.
 
 
 28
 ....
 
 
 29
 (m) Disclose to defendant's attorney its intent to use any statements or confessions made by the defendant to law enforcement officials....
 
 
 30
 The discovery conference was held on December 2, 1993. In the Joint Statement of Discovery Conference, the government represented that "[a]ll materials currently known to the Government and favorable to the defendant within the meaning of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) have been provided to the defendant" and "[c]ounsel for both parties state[d] that presently there are no additional matters of discovery presently known." On January 5, 1994, five days before trial was set to begin, the government provided Ms. Ivy's counsel with a five-page FBI form 302 summarizing statements Ms. Ivy had made during interviews on January 11 and 14, 1993, approximately one year earlier. Ms. Ivy filed a written objection one day later, requesting that the court "deny introduction of any testimony related to this evidence," because, according to Ms. Ivy, "[e]xclusion of any testimony regarding the materials provided is the only realistic sanction. Anything short of exclusion does not provide a remedy to the Defendant and does not deter future violation." Ms. Ivy expressly stated she did not want a continuance.
 
 
 31
 On January 10, 1994, shortly before jury selection, the district court asked the government to explain why it had failed to disclose the five-page report earlier. The government stated:
 
 
 32
 Many of these defendants have been involved in investigations and trials, that we've had to go back and ask for files to be pulled up from Fort Worth and other areas that have been in storage. And as soon as we have gotten these documents, we have furnished them. These are not documents that have sat around in our office or sat around at the FBI office waiting for them to be given up. The minute we have had them, we have made copies for all the defense attorneys and we furnished them to them as soon as we have had them in our hands.... We are complying with information as far as Jencks and Brady way above and beyond what the statute says or even requires. We have turned over the entirety of the file, which is not even required.
 
 
 33
 Ms. Ivy pointed out that the agent who interviewed her in January 1993 was Agent Hersley, the case agent assigned to the present case. She argued Agent Hersley should have recalled the interview and mentioned it to the government. She also contended the delay in obtaining this and many other discovery items had made it difficult to prepare for trial. The district court asked the government when it planned to use the five-page report, and it stated it planned to use it during the direct examination of Agent Hersley, the first witness scheduled to testify the next day. The district court responded:
 
 
 34
 Well, we're not going to do it that way. They are going to need some additional time. I don't understand, despite your explanation, why these statements that are a year old weren't provided long ago. But in any event, I'm going to give you some additional time on those.
 
 
 35
 ... I assume you've all looked at them already. I don't see any prejudice to any of you, the fact that you've gotten them late in the game. I don't see how that would change anything. But look at them over the evening ... and discuss them with your client, and ... if there's a question about the voluntariness of those statements, ... we'll just take that up first thing in the morning.
 
 
 36
 Later in the hearing, the district court repeated that it did not "want any of you to feel prejudiced by the lateness of evidence, as to your ability to prepare and adequately represent your clients. And anything of significance which you feel like you need a little more time to study it, overnight to study it, whatever, I'll be glad to accommodate you in that regard."
 
 
 37
 On the following morning, before the government called Agent Hersley to the stand, the district court asked Ms. Ivy's counsel if he had examined the five-page report overnight, and he responded that he had. The government then called Agent Hersley and questioned him at length regarding his interview with Ms. Ivy in January 1993. Ms. Ivy renewed her discovery objection and also asked the court to redact evidence Ms. Ivy committed crimes other than those alleged in the indictment. The district court overruled both objections. The government relied on the statements Ms. Ivy made to Agent Hersley during closing arguments.
 
 
 38
 Ms. Ivy now contends the government violated the district court's November 5, 1993 discovery order and Fed.R.Crim.P. 16(a)(1)(A) by failing to disclose the five-page report until five days before trial was scheduled to begin. Even if we assume for the sake of discussion that Ms. Ivy is correct, a point the government vigorously disputes, we see no basis for reversal. When it comes to the district court's attention that the government has failed to comply with Fed.R.Crim.P. 16, "the court may order [the government] to permit the discovery or inspection, grant a continuance, or prohibit the [government] from introducing evidence not disclosed, or it may enter such other order as it deems just under the circumstances." Fed.R.Crim.P. 16(d)(2).
 
 
 39
 [T]he factors the district court should consider in determining if a sanction is appropriate are (1) the reasons the government delayed producing the requested materials, including whether or not the government acted in bad faith when it failed to comply with the discovery order; (2) the extent of prejudice to the defendant as a result of the government's delay; and (3) the feasibility of curing the prejudice with a continuance.
 
 
 40
 United States v. Wicker, 848 F.2d 1059, 1061 (10th Cir.1988). If after considering these factors the district court concludes sanctions are appropriate, it must impose the " 'least severe sanction that will accomplish ... prompt and full compliance with the court's discovery orders.' " Id. at 1060 (quoting United States v. Fernandez, 780 F.2d 1573, 1576 (11th Cir.1986)). We review both the district court's decision whether to impose sanctions and its choice of sanctions for abuse of discretion. Id.
 
 
 41
 Contrary to Ms. Ivy's contention, the district court considered each of the three Wicker factors. First, although the district court initially stated it did not "understand, despite [the government's] explanation, why these statements that are a year old weren't provided long ago," it later concluded that "this is a large case. I know its been difficult on both sides to prepare it. And I'm satisfied the Government is doing the best they can, as far as coming forward with what they've got." Second, it questioned defense counsel at some length regarding the prejudice Ms. Ivy might suffer due to the delay in discovery. Counsel responded that he had not had adequate time to review the five-page report, as well as the other discovery items. Third, the district court asked whether counsel wanted a continuance, and he responded he did not want to jeopardize Ms. Ivy's right to a speedy trial. Having considered these factors, the district court told counsel to review the five-page report over night, discuss it with Ms. Ivy, and advised him it would "be glad to accommodate you in that regard ... if ... you think that you are just not prepared because of the failure of the Government to turn over evidence."
 
 
 42
 We conclude the district court's handling of this issue was perfectly reasonable, and that it did not abuse its discretion. Ms. Ivy offers no persuasive basis for questioning the district court's finding the government had done the best it could to provide discovery in a timely fashion. With respect to the second Wicker factor, prejudice, it is highly significant that the discovery in question was merely a transcription of Ms. Ivy's own statements. It is difficult to believe neither Ms. Ivy nor her attorney were aware she had made these statements or that they were surprised when they learned the government planned to use the transcript against her at trial. See United States v. Rivera, 944 F.2d 1563, 1566 (11th Cir.1991) (defendant not unduly surprised or deprived of an adequate opportunity to prepare a defense where government provided discovery of defendant's own statements immediately before opening argument); see also United States v. Basinger, 60 F.3d 1400, 1407 (9th Cir.1995) (defendant was not prejudiced by government's failure to provide discovery because he could have anticipated the government would attempt to introduce such evidence). Furthermore, when, as in this case, the defendant does not request a continuance after receiving belated discovery, "a court can often assume that counsel did not need more time to incorporate the information into the defense's game plan." United States v. Sepulveda, 15 F.3d 1161, 1178 (1st Cir.1993). Given the nature of the discovery and Ms. Ivy's refusal to seek a continuance, the district court's recommendation that Ms. Ivy and her attorney review the five-page report overnight and inform him if they believed the delay in discovery would prevent them from preparing an adequate defense was more than enough to alleviate the minimal prejudice resulting from the government's delay. Finally, the third Wicker factor is essentially irrelevant, because Ms. Ivy made it clear she did not want a continuance.
 
 B. Motion for a Bill of Particulars
 
 43
 Ms. Ivy, Ms. Traylor, and Mr. Norwood moved to dismiss the superseding indictment filed on November 3, 1993, or in the alternative, for a bill of particulars specifying the dates on which the offenses alleged therein occurred. On January 4, 1993, before the district court ruled on these motions, the grand jury returned a second superseding indictment. Two days later, before defendants had an opportunity to renew or withdraw their motions in light of the second superseding indictment, the district court denied their motions on the merits. The district court acknowledged the second superseding indictment, but stated in a footnote that "[t]he Court treats Defendants' motions as directed to each count in the latest Indictment which does not allege a specific date on or about which the event occurred." Mr. Norwood and Ms. Traylor, but not Ms. Ivy, now contend the district court erred in denying their motion for a bill of particulars.
 
 
 44
 "The purpose of a bill of particulars is to inform the defendant of the charge against him with sufficient precision to allow him to prepare his defense." United States v. Levine, 983 F.2d 165, 166-67 (10th Cir.1992) (citations and internal quotation marks omitted). "A bill of particulars is not necessary if the indictment sets forth the elements of the offense charged and sufficiently apprised the defendant of the charges to enable him to prepare for trial." Id. at 167 (citations and internal quotation marks omitted). "[T]he defendant is not entitled to notice of all of the evidence the government intends to produce, but only the theory of the government's case." Id. (citations and internal quotation marks omitted) (emphasis in the original). We review the denial of a motion for a bill of particulars for an abuse of discretion, United States v. Kunzman, 54 F.3d 1522, 1526 (10th Cir.1995), and we will not reverse "unless defendant shows that he was actually surprised at trial and thereby incurred prejudice to his substantial rights." Levine, 983 F.2d at 166 (citation and internal quotation marks omitted).
 
 
 45
 The government contends Mr. Norwood and Ms. Traylor had ample opportunity to prepare their defense, and therefore cannot demonstrate "actual surprise," because they were each provided with complete discovery. See Levine, 983 F.2d at 167 ("Given the full disclosure here, the district court's denial was appropriate, and certainly not an abuse of discretion."); United States v. Sturmoski, 971 F.2d 452, 460 (10th Cir.1992). Mr. Norwood and Ms. Traylor do not dispute the government's assertion they were provided with complete discovery, nor do they contend the discovery the government provided did not contain sufficient information to allow them to prepare an adequate defense. Rather, they contend "[t]he counts in the indictment referred to such time frames as to make effective preparation an impossibility," and they were unable to prepare an adequate defense despite full discovery, because the discovery was delayed and because "the government did not even attempt to identify which part of the 'volumes of discovery' clarified any of the dates or reduced the time span against which [they were] forced to defend." They also assert in conclusory fashion that "the wide time frames contained in the specific counts failed to provide adequate notice, the realistic opportunity to present an alibi defense and the chance to effectively confront the accusers."
 
 
 46
 We reject Mr. Norwood and Ms. Traylor's contentions. By providing complete discovery containing sufficient information to allow them to prepare their defense, the government gave Mr. Norwood and Ms. Traylor the tools necessary to anticipate and forestall any surprise that might have resulted from the indictment. Once the government provided these tools, it was Mr. Norwood's and Ms. Traylor's responsibility to use them in preparing their defense, regardless of whether the discovery was copious and the preparation of the defense was difficult. Because they had these tools available to them, and because they have done nothing more than make conclusory assertions of prejudice, we conclude neither Mr. Norwood nor Ms. Traylor have sustained their burden of showing they suffered "actual surprise." We therefore will not disturb the district court's ruling.
 
 C. Suppression of Testimony
 
 47
 On the first day of trial, Ms. Ivy, Mr. Norwood, and Ms. Traylor moved to suppress the testimony of Flora Ingram, Nathaniel Washington, Orville Nelson, and Richard Ingram, all of whom had entered into plea agreements with the government. According to these three defendants, the government knowingly understated the quantity of drugs attributable to Ms. Ingram, Mr. Ingram, Mr. Nelson, and Mr. Washington when it drafted their plea agreements. These asserted misrepresentations, the defendants contended, violated certain specific provisions of the United States Sentencing Guidelines, and also violated their right to a fair trial under the due process clause of the Fifth Amendment, inasmuch as they would render Ms. Ingram's, Mr. Ingram's, Mr. Nelson's, and Mr. Washington's testimony inherently unreliable. They further contended that in light of the asserted misrepresentations, Ms. Ingram's, Mr. Ingram's, Mr. Nelson's, and Mr. Washington's testimony would be "illegally obtained" and should be suppressed as a deterrent. During the hearing on the motions, Ms. Ivy conceded, and we agree, that the government would have been entitled to dismiss all of the charges against Ms. Ingram, Mr. Ingram, Mr. Nelson, and Mr. Washington, and that she lacked standing to contend the government had violated their rights under the due process clause of the Fifth Amendment by using the plea agreement to coerce their trial testimony, but contended that by instead choosing to merely understate the quantity of drugs, the government was "perpetrating a fraud on the Court." After hearing argument from the government, the district court concluded Ms. Ivy, Mr. Norwood, and Ms. Traylor were entitled to cross-examine Ms. Ingram, Mr. Ingram, Mr. Nelson, and Mr. Washington regarding the terms of their plea agreements, but that there was no sound basis for preventing them from testifying.
 
 
 48
 Mr. Norwood and Ms. Traylor, but not Ms. Ivy, now renew their contention the district court should have barred Ms. Ingram, Mr. Ingram, and Mr. Nelson from testifying, because the government misrepresented the quantity of drugs attributable to them in their plea agreements.[3] We conclude their contention is without merit for the following reasons. First, in order to accept their position, we would be required to hold that in every case in which some defendants choose to plead guilty while others choose to stand trial, a very common situation indeed, those who go to trial have standing to challenge the validity of their codefendants' plea agreements and the factual bases of their guilty pleas. Such challenges would require the government to prove the factual representations made in the plea agreements and during the plea colloquies of any codefendants from whom it planned to elicit testimony. It would also force the district court and the court of appeals to entertain what would essentially be a collateral attack on a guilty plea by those who chose to stand trial, whether or not the party who pled guilty has any desire to challenge his conviction. We are unwilling to impose such burdens on the government and the courts or to so completely pervert the existing procedures. Second, we agree with the district court that the terms of a codefendants' plea agreement may be raised during cross-examination for impeachment purposes and that any prejudice resulting from such a plea agreement can be adequately explored and dispelled in this manner.
 
 
 49
 Third, Mr. Norwood's and Ms. Traylor's charge that the government misrepresented the quantity of drugs in Ms. Ingram's, Mr. Ingram's, and Mr. Nelson's plea agreements is not only incorrect, but it also reveals a fundamental misunderstanding of the United States Sentencing Guidelines. Mr. Ingram's, Mr. Nelson's, and Mr. Washington's plea agreements provide that "[p]ursuant to § 1B1.8 of the Sentencing Guidelines, the Government agrees that no information provided by the defendant as a result of this agreement shall be used against the defendant in determining the applicable sentencing guideline range." U.S.S.G. § 1B1.8(a) provides as follows:
 
 
 50
 Where a defendant agrees to cooperate with the government by providing information concerning unlawful activities of others, and as part of that cooperation agreement the government agrees that self-incriminating information provided pursuant to the agreement will not be used against the defendant, then such information shall not be used in determining the applicable guideline range, except to the extent provided in the agreement.
 
 
 51
 Although this guideline provision is critical for a number of reasons, one of its most important advantages is that it encourages codefendants to cooperate with the government by ensuring that their statements will not be used against them during sentencing. United States v. Shorteeth, 887 F.2d 253, 257 (10th Cir.1989). Such cooperation is particularly valuable in conspiracy cases, because it allows the government to penetrate the shroud of secrecy that typically surrounds such criminal activities. See United States v. Andrews, 585 F.2d 961, 964 (10th Cir.1978). Because Ms. Ingram's, Mr. Ingram's, and Mr. Nelson's plea agreements provide them immunity under U.S.S.G. § 1B1.8(a), the government could only use evidence admissible under the express terms of the plea agreement, Shorteeth, 887 F.2d at 257, or one of the exceptions listed in U.S.S.G. § 1B1.8(b). Among other things, U.S.S.G. § 1B1.8(b) makes it clear the immunity granted under U.S.S.G. § 1B1.8(a) "shall not be applied to restrict the use of information ... known to the government prior to entering into the cooperation agreement." U.S.S.G. § 1B1.8(b)(1); see United States v. Easterling, 921 F.2d 1073, 1079-80 (10th Cir.1990), cert. denied, 500 U.S. 937, 111 S.Ct. 2066, 114 L.Ed.2d 470 (1991). To determine what evidence would be admissible during sentencing, we look to what the defendant reasonably understood would be admitted in light of the grant of U.S.S.G. § 1B1.8(a) immunity and the other terms of his plea agreement. Easterling, 921 F.2d at 1079-80.
 
 
 52
 In their plea agreements, Mr. Ingram and Mr. Nelson acknowledged that "[a]t the signing of this Plea Agreement, the government was aware of approximately" 150 to 500 grams of crack cocaine were attributable to them for sentencing purposes, and Ms. Ingram acknowledged "the government was aware [she] was responsible for the distribution of approximately 5 to 20 grams of cocaine base." The crux of Mr. Norwood's and Ms. Traylor's argument is that on the dates the plea agreements were signed, the government was aware of more drugs than were stated in those agreements. We acknowledge that the government's choice of words was unfortunate, and that the plea agreements, as worded, could arguably be read as meaning that the amounts stated represented the government's full knowledge on the date of signing. The government explains, however, that the plea agreements resulted from negotiations begun weeks or even months before the plea agreements were actually reduced to writing and signed, and that the quantities listed in the agreements are those the government was aware of before plea negotiations began. The government also states that any other evidence it had regarding Ms. Ingram's, Mr. Ingram's, and Mr. Nelson's involvement in the Norwood/Hickman conspiracy or the amount of drugs attributable to them was very vague, and was not sufficient to prove additional drug quantities by a preponderance of the evidence. We see nothing in Mr. Norwood's or Ms. Traylor's briefs on appeal that would tend to refute the government's representations, and we therefore accept them as true. In light of these representations, it appears the government was not attempting to misstate the quantity of drugs attributable to Ms. Ingram, Mr. Ingram, Mr. Nelson, but was instead attempting to honor the letter and spirit of their plea agreements by declining to rely on evidence obtained from them during the course of plea negotiations.
 
 D. Sufficiency of the Evidence
 
 53
 Mr. Taylor contends there is insufficient evidence to support his convictions on count 1 of the superseding indictment, conspiracy to possess with intent to distribute and to distribute cocaine powder and/or cocaine base in violation of 21 U.S.C. §§ 841(a)(1) and 846, and count 27 of the superseding indictment, possession with the intent to distribute approximately one-half ounce of crack cocaine in or about late June 1993, in violation of 21 U.S.C. § 841(a)(1). In evaluating a challenge to the sufficiency of the evidence,
 
 
 54
 we review the record de novo, and ask only whether, taking the evidence--both direct and circumstantial, together with the reasonable inferences to be drawn therefrom--in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt. In order to conclude the evidence was insufficient, as a matter of law, to support a conviction, we must find that no reasonable juror could have reached the disputed verdict.
 
 
 55
 United States v. Owens, 70 F.3d 1118, 1126 (10th Cir.1995) (citation omitted). We will not reverse a conviction merely because the verdict was grounded on the uncorroborated testimony of a coconspirator. United States v. Sloan, 65 F.3d 861, 863 (10th Cir.1995) (it is the "general rule" in this Circuit "that in a criminal case a jury may convict a defendant on the uncorroborated testimony of an accomplice" (emphasis in original)), cert. denied, --- U.S. ----, 116 S.Ct. 824, 133 L.Ed.2d 767 (1996); United States v. McGuire, 27 F.3d 457, 462 (10th Cir.1994). "To the extent that the evidence conflicts, we accept the jury's resolution of conflicting evidence and its assessment of the credibility of witnesses." United States v. Sapp, 53 F.3d 1100, 1103 (10th Cir.1995) (citations and internal quotation marks omitted), cert. denied, --- U.S. ----, 116 S.Ct. 796, 133 L.Ed.2d 744 (1996).
 
 1. Count 1--Conspiracy
 
 56
 Mr. Taylor contends, and we agree, that the trial evidence showed Mr. Norwood was the head of the conspiracy charged in count 1 of the superseding indictment, that at least three of Mr. Norwood's "girlfriends," Ms. Ivy, Ms. Traylor, and Ms. Holmes, assisted Mr. Norwood, and that Mr. Hickman was in charge of distributing crack cocaine to Mr. Norwood's retail dealers. However, according to Mr. Taylor, there was no evidence showing he was part of that conspiracy. Instead, he asserts the evidence showed only that he was one of many low-level crack cocaine dealers in Kerr Village, and his only link to the five-year Norwood/Hickman conspiracy was that he purchased crack cocaine from Mr. Hickman on three or four occasions, which he asserts Mr. Hickman may or may not have gotten from Mr. Norwood. He also asserts that he performed no specific task within the conspiracy, that he was not necessary to its success, and that if he withdrew from the conspiracy Mr. Hickman could have quite easily sold his crack cocaine to some other street-level dealer. Given his minimal contact with the Norwood/Hickman organization, he contends the evidence is insufficient to support an inference he was a member of this "multi-kilogram, multi-player conspiracy."To obtain a conviction for conspiracy "the government must show ' that two or more persons agreed to violate the law, that the Defendant knew at least the essential objectives of the conspiracy, ... that the Defendant knowingly and voluntarily became a part of it,' and that the alleged coconspirators were interdependent." United States v. Evans, 970 F.2d 663, 668 (10th Cir.1992) (quoting United States v. Fox, 902 F.2d 1508, 1514 (10th Cir.), cert. denied, 498 U.S. 874, 111 S.Ct. 199, 112 L.Ed.2d 161 (1990)), cert. denied, 507 U.S. 922, 113 S.Ct. 1288, 122 L.Ed.2d 680 (1993). Mr. Taylor's contention calls us to address what has become a recurring problem in our drug conspiracy jurisprudence: how involved a low-level dealer must be in order to be considered a member of a conspiracy to distribute drugs. In resolving this question, we often find ourselves trapped in a dilemma between the principle that "[t]he nature of the offense of conspiracy with its attendant aspects of secrecy often requires that elements of the crime be established by circumstantial evidence," Andrews, 585 F.2d at 964, and the even more vital principle that "[g]uilt with us remains individual and personal, even as respects conspiracies. It is not a matter of mass application." Kotteakos v. United States, 328 U.S. 750, 772, 66 S.Ct. 1239, 1252, 90 L.Ed. 1557 (1946). In addition, as Mr. Taylor has astutely observed, our precedents are often very fact specific, and do not always provide clear guidance. There are, however, two recurring themes. First, "[t]he fact of defendant's presence at the crime scene is material and probative, but mere presence 'is not sufficient in and of itself,' " United States v. Nicholson, 983 F.2d 983, 989 (10th Cir.1993) (quoting United States v. Savaiano, 843 F.2d 1280, 1294 (10th Cir.), cert. denied, 488 U.S. 836, 109 S.Ct. 99, 102 L.Ed.2d 74 (1988)), nor is it sufficient "for the government to show only mere association with conspirators known to be involved in crime." Evans, 970 F.2d at 669 (citation and internal quotation marks omitted). Second, the government must do more than show there were "[c]asual transactions between the defendant and the conspirators known to be involved in crime," id. (quoting United States v. Horn, 946 F.2d 738, 741 (10th Cir.1991) (citation and internal quotation marks omitted)), or that there was "a buyer-seller relationship between the defendant and a member of the conspiracy," id. (citing United States v. Fox, 902 F.2d 1508, 1514 (10th Cir.), cert. denied, 498 U.S. 874, 111 S.Ct. 199, 112 L.Ed.2d 161 (1990)). With these principles in mind, we turn to the evidence in this case.
 
 
 57
 Mr. Taylor's reliance on our buyer-seller cases is misplaced. Our opinion in Evans, 970 F.2d 663, is instructive regarding the "buyer-seller" rule. In that case, a jury convicted Ms. Brice of conspiracy to distribute crack cocaine. The evidence showed only that in 1988 Ms. Brice purchased four ounces of crack cocaine from Carl Walker, one of the central figures in the conspiracy, that Ms. Brice lent scales to two members of the conspiracy, James Joubert and Eric Rentie, with full knowledge that they intended to use them to weigh cocaine, and that Ms. Brice purchased one-sixteenth ounce of crack cocaine from two unindicted individuals who were not members of the conspiracy. Id. at 673 & n. 12. We vacated Ms. Brice's conspiracy conviction. Id. at 673. We held, among other things, that there was insufficient evidence to prove Ms. Brice "shared in the common distribution objective of the conspiracy," because there was no direct or circumstantial evidence Ms. Brice distributed the four ounces of crack cocaine she purchased from Mr. Walker. Id. at 673. Elsewhere in our opinion, we explained that
 
 
 58
 [t]he objective of the conspiracy becomes especially important when the government attempts to establish a conspiracy on the basis of purchases and sales. Evidence that an intermediate distributor bought from a supplier might be sufficient to link that buyer to a conspiracy to distribute drugs because both buyer and seller share the distribution objective. However, a consumer generally does not share the distribution objective and thus would not be part of a conspiracy to distribute crack cocaine. Of course, a consumer may conspire to possess crack cocaine.
 
 
 59
 Id. at 669 (emphasis in original). Therefore, the purpose of the buyer-seller rule is to separate consumers, who do not plan to redistribute drugs for profit, from street-level, mid-level, and other distributors, who do intend to redistribute drugs for profit, thereby furthering the objective of the conspiracy. See United States v. Roberts, 14 F.3d 502, 513 (10th Cir.1993) (buyer-seller rule inapplicable because circumstantial evidence showed defendant was more than just an end user); Horn, 946 F.2d at 741 ("Casual transactions with persons involved in a conspiracy are insufficient to establish that critical connection--one who merely purchases drugs or property for personal use from a member of a conspiracy 'does not thereby become a member of the conspiracy.' ") (emphasis added) (quoting Fox, 902 F.2d at 1514).
 
 
 60
 The evidence in this case shows Mr. Taylor was much more than a consumer or end-user of crack cocaine. Orville Nelson testified that he once went to Mr. Taylor's house and bought one-half ounce of crack cocaine, which he intended to resell on the street. He explained that "you couldn't just go in and get a half-ounce ... just from nobody," but that Mr. Taylor was not just "a nobody." Mr. Nelson testified he "just [knew] that [Mr. Taylor was] the type of person to keep a little weight ... selling ounces and halves." Flora Ingram also testified Mr. Taylor received one-half ounce of crack cocaine from Mr. Hickman, gave him $350, and promised to pay Mr. Hickman the rest after he sold the crack cocaine. On another occasion, Ms. Ingram went to Mr. Taylor's house and saw one-half ounce of crack cocaine cut up into sixteenth-ounce packets. While Ms. Ingram was at Mr. Taylor's house, she saw him sell one of the sixteenth-ounce packets to a smoker. Moty Davis testified Mr. Taylor received one-half ounce and one-ounce quantities of crack cocaine from Mr. Hickman on at least three or four occasions. Sometimes Mr. Hickman fronted the crack cocaine to Mr. Taylor and other times Mr. Taylor paid cash. Orville Nelson, Billie England, Moty Davis, and Nigel Clay testified they saw Mr. Taylor distribute crack cocaine in Kerr Village. In light of this evidence, a reasonable jury could find Mr. Taylor redistributed crack cocaine for profit.
 
 
 61
 We also reject Mr. Taylor's contention he had no link with the Norwood/Hickman conspiracy. Mr. Taylor had strong ties to Mr. Hickman. As noted above, Mr. Hickman supplied him with substantial quantities of crack cocaine. In addition, Mr. Taylor referred at least one customer to Mr. Hickman. Moty Davis testified that Mr. Taylor told him Mr. Hickman could supply him with crack cocaine. Mr. Davis relied on Mr. Taylor's advice, contacted Mr. Hickman, and purchased one-quarter to one-half ounce quantities from him on three or four occasions. Mr. Taylor and Mr. Hickman also received referrals from the same individual. Billie England, Ms. Ingram's uncle, testified he used to help get retail customers for Ms. Ingram, Mr. Hickman, Mr. Taylor and others in exchange for crack cocaine.
 
 
 62
 The above evidence is more than enough to link Mr. Taylor to Mr. Hickman. However, the fact Mr. Taylor was linked to Mr. Hickman does not necessarily mean Mr. Taylor's activities were interdependent with the larger Norwood/Hickman conspiracy. A defendant's activities are interdependent if they "facilitated the endeavors of other alleged conspirators or facilitated the venture as a whole." Horn, 946 F.2d at 740-41. If it were true, as Mr. Taylor asserts, that there is no direct or circumstantial evidence that any of the drugs Mr. Hickman distributed to him came from Mr. Norwood, but that all of those drugs came from some other source unconnected with the Norwood/Hickman conspiracy, and if it were also true that the transactions Mr. Taylor facilitated between Mr. Hickman and Mr. Davis and the retail transactions Mr. England set up for Mr. Taylor did not benefit the Norwood/Hickman conspiracy, but only Mr. Taylor and Mr. Hickman, we would agree that a reasonable jury could not find Mr. Taylor's activities were interdependent. Under such circumstances, the success of the Norwood/Hickman conspiracy's efforts to distribute would in no way depend upon the success of Mr. Taylor's own efforts. See Roberts, 14 F.3d at 511; Fox, 902 F.2d at 1515. We reject Mr. Taylor's position, however. The evidence shows Mr. Hickman received the majority of his supply from Mr. Norwood and that he held a prominent position in Mr. Norwood's organization. This supports an inference that the majority of the crack cocaine Mr. Hickman redistributed to others, including Mr. Taylor, came from Mr. Norwood. See United States v. Torres, 53 F.3d 1129, 1135 (10th Cir.) ("the absence of any direct evidence of a conspiracy is immaterial so long as there is sufficient circumstantial evidence to support a finding of guilt beyond a reasonable doubt"), cert. denied, --- U.S. ----, 115 S.Ct. 2599, 132 L.Ed.2d 845 (1995). Furthermore, Ms. Ingram testified that in June 1993, Mr. Norwood was supplying crack cocaine to Mr. Hickman and Nathaniel Washington, and that during that same period Mr. Taylor purchased one-half ounce of crack cocaine from Mr. Hickman. We also reject Mr. Taylor's contention that he was not part of the Norwood/Hickman conspiracy because he easily could have been replaced. Whether or not someone else could have performed Mr. Taylor's function as well or better than he did, the fact still remains that it was Mr. Taylor who chose to do so.
 
 
 63
 In light of the above, we conclude there was sufficient evidence to support Mr. Taylor's conspiracy conviction.
 
 2. Possession with Intent to Distribute
 
 64
 We have no difficulty concluding there is sufficient evidence to support Mr. Taylor's conviction for possession with intent to distribute approximately one-half ounce of crack cocaine in July 1993, as alleged in count 27 of the superseding indictment. During trial, the government asked Ms. Ingram who Mr. Norwood was selling cocaine to in the Kerr Village in June 1993. Ms. Ingram testified he was selling crack cocaine to Mr. Hickman and Nathaniel Washington, and that Mr. Hickman redistributed it in one-half ounce and one ounce quantities to Mr. Chitwood, Moty Davis, Bullet, Snook, and "[a] lot of other little people around there." She then testified Mr. Taylor once wanted to buy one-half ounce of crack cocaine from Mr. Hickman, but he only had $350 of the $500 purchase price. Mr. Hickman gave Mr. Taylor the one-half ounce of crack cocaine he asked for, took his $350, and told him to pay the rest later, which Mr. Taylor did.
 
 
 65
 Mr. Taylor acknowledges Ms. Ingram's testimony, but contends it cannot support his conviction for two reasons. First, he points out Ms. Ingram testified only that Mr. Hickman sold him a "half-ounce," and "she never identified the substance as anything illegal." This argument is specious: it is obvious from the context that the substance was indeed something illegal, namely crack cocaine. Second, Mr. Taylor contends Ms. Ingram's testimony cannot support his conviction because it was based on hearsay statements Mr. Hickman made to her, and because Mr. Hickman's hearsay statements were not admissible under the coconspirator exception to the hearsay rule. See Fed.R.Evid. 801(d)(2)(E). Mr. Taylor is correct that Ms. Ingram's testimony was based, at least in part, on hearsay. Ms. Ingram testified she was present and saw Mr. Hickman and Mr. Taylor discuss the transaction. However, she admitted Mr. Taylor and Mr. Hickman walked out of earshot to discuss at least part of the deal because Mr. Taylor was embarrassed about not having enough money, and she did not find out the details until Mr. Hickman got back into the car and told her. Ms. Ingram also stated the only reason she knew Mr. Taylor paid Mr. Hickman the rest of the money he owed was because Mr. Hickman told her he had. Mr. Taylor did not make a contemporaneous objection to Ms. Ingram's testimony. The failure to object to the introduction of evidence is deemed a waiver of the objection absent plain error. United States v. Jones, 44 F.3d 860, 875 (10th Cir.1995). "A plain error is one that is obvious or ... seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." Id. (citations and internal quotation marks omitted). Given the evidence Mr. Taylor participated in the Norwood/Hickman conspiracy, discussed in part II.D.1 ante, the admission of Ms. Ingram's testimony was not plain error.
 
 E. Prosecutorial Misconduct
 
 66
 During closing arguments, the government stated there was evidence Mr. Taylor had received some of the "gasoline crack" Mr. Norwood distributed in the summer of 1993. Mr. Taylor objected on the ground "there has been no testimony at all" to that effect. The district court overruled Mr. Taylor's objection, stating "[w]e'll leave it to the jury to determine what the evidence is." The prosecutor then explained that the evidence showed Mr. Davis, Mr. Clay, Mr. Hickman, and Mr. Taylor played dice together in June 1993, and Mr. Norwood delivered crack cocaine to Mr. Hickman during the games, which was ostensibly the gasoline crack Mr. Norwood was distributing during that time.
 
 
 67
 Mr. Taylor now renews his contention the government misrepresented the evidence and asserts her misrepresentation amounts to prosecutorial misconduct. We use a two-step process when evaluating claims of prosecutorial misconduct. United States v. Lonedog, 929 F.2d 568, 572 (10th Cir.), cert. denied, 502 U.S. 854, 112 S.Ct. 164, 116 L.Ed.2d 129 (1991). First, we examine "whether the conduct was, in fact, improper." Id. If we answer that question in the affirmative, "we must then determine whether it warrants reversal." Id. "An allegation of prosecutorial misconduct presents a mixed question of fact and law that we review de novo." United States v. Ramirez, 63 F.3d 937, 944 (10th Cir.1995).
 
 
 68
 The government now concedes, and our review of the record confirms, that none of the witnesses specifically testified that Mr. Taylor received any of the gasoline crack, and that to the extent it stated to the contrary it mischaracterized the evidence. The government also essentially concedes this mischaracterization amounted to misconduct. The government contends, however, that its admitted misconduct does not warrant reversal. "A prosecutor's improper statement to the jury is harmless unless 'there is reason to believe that it influenced the jury's verdict.' " Ramirez, 63 F.3d at 944 (quoting United States v. Alexander, 849 F.2d 1293, 1296 (10th Cir.1988)). "In assessing whether the misconduct had such an impact, we consider the trial as a whole, including 'the curative acts of the district court, the extent of the misconduct, and the role of the misconduct within the case.' " Id. (quoting United States v. Martinez-Nava, 838 F.2d 411, 416 (10th Cir.1988)). We ordinarily will not reverse if the misconduct was merely "singular and isolated." United States v. Pena, 930 F.2d 1486, 1491 (10th Cir.1991). Rather, "[t]o warrant reversal, the misconduct must have been 'flagrant enough to influence the jury to convict on grounds other than the evidence presented.' " Ramirez, 63 F.3d at 944 (quoting United States v. Lowder, 5 F.3d 467, 473 (10th Cir.1993)).
 
 
 69
 The government contends, and we agree, that the misstatements were "singular and isolated" when viewed in the context of the entire two-week trial, in the sense that the misstatements refer to only one transaction occurring over the course of a five-year conspiracy. However, in contrast to many of our decisions holding prosecutorial misconduct during closing arguments was not prejudicial, the district court failed to instruct the jury that counsel's statements during closing arguments are not evidence. See Ramirez, 63 F.3d at 944-45; Pena, 930 F.2d at 1491. The district court merely stated "[w]e'll leave it to the jury to determine what the evidence is" when it overruled Mr. Taylor's objection. It is questionable whether the district court's statement did much to relieve the prejudice flowing from the government's misstatement of the evidence. However, given the other evidence showing Mr. Taylor participated in the Norwood/Hickman conspiracy, it is unlikely the government's misstatement was " 'flagrant enough to influence the jury to convict on grounds other then the evidence presented.' " Ramirez, 63 F.3d at 944 (quoting Lowder, 5 F.3d at 473). Indeed, whether or not Mr. Taylor received some of the "gasoline crack" from Mr. Norwood is of little consequence, because, as we have explained in part II.D.1 of this opinion, there was other, adequate evidence to support a finding that the crack cocaine Mr. Hickman sold Mr. Taylor came from Mr. Norwood. We therefore conclude reversal is not warranted.
 
 III. Sentencing Issues
 A. Quantity of Drugs
 
 70
 During the sentencing hearing, Agent Hersley testified that, on the basis of his investigation, the amount of crack cocaine Mr. Norwood distributed over the course of the five year conspiracy "would fall within the range of at least 20 kilograms ... and more likely approximating 50 kilograms." He based this estimate on Ms. Ingram's statement that after February 1990, when she first became involved in the Norwood/Hickman conspiracy, she and Mr. Hickman personally distributed 20 kilograms of crack cocaine that they had received from Mr. Norwood, and that the additional amounts Mr. Norwood distributed through Ms. Ivy, Ms. Traylor, and others, approached 30 kilograms, for a total of approximately 50 kilograms. Agent Hersley also testified that he had interviewed Orville Nelson, Moty Davis, Nigel Clay, and Richard Ingram, and others, and that their statements corroborated Ms. Ingram's estimate. Mr. Nelson, Mr. Davis, Mr. Clay, and Mr. Ingram told Agent Hersley that at any given time, 12 to 15 mid-level distributors were selling between one and three ounces of crack cocaine per week in Kerr Village, and they were obtaining the majority of their supply from Mr. Norwood for a period of at least three years. Agent Hersley testified that he estimated the total amount of crack cocaine attributable to Mr. Norwood by using the most conservative figures, and concluded that if twelve individuals sold one ounce of crack cocaine per week for three years, fifty weeks per year, the total amount sold would be 1,800 ounces, which equals 112.5 pounds, or approximately 51 kilograms. This estimate did not include any amounts Mr. Norwood distributed before February 1990. After hearing Agent Hersley's testimony and rereading its own notes taken during the trial, the district court concluded that "during the scope of this conspiracy, at least 20 kilograms of crack cocaine were distributed." It explained that this estimate "was testified to by Flora Ingram and supported cumulatively by numerous other witnesses." The district court also found that 20 kilograms of crack cocaine were individually attributable to Mr. Norwood, Mr. Hickman, Ms. Traylor.
 
 
 71
 Mr. Norwood, Mr. Hickman, and Ms. Traylor now challenge the district court's finding. The rules for calculating of drug quantities in conspiracy cases are well established. "The drug amount attributable to a defendant for purposes of sentencing is not established merely by looking to the amount of drugs involved in the conspiracy as a whole," but only to "the quantity of drugs which he reasonably foresaw or which fell within 'the scope' of his particular agreement with the conspirators." Roberts, 14 F.3d at 522 (quoting United States v. Castaneda, 9 F.3d 761, 769-70 (9th Cir.1993), cert. denied, --- U.S. ----, 114 S.Ct. 1564, 128 L.Ed.2d 210 (1994)); see also Torres, 53 F.3d at 1144 ("The touchstone ... is whether the quantities were reasonably foreseeable to the coconspirators in light of the nature, extent, and purpose of the conspiracy"); United States v. Ortiz, 993 F.2d 204, 207 (10th Cir.1993); U.S.S.G. § 1B1.3, comment. (n. 2). Courts may rely on estimates to approximate the quantity of drugs attributable to a defendant, provided there are " 'sufficient indicia of reliability to support [the estimate's] probable accuracy.' " Ortiz, 993 F.2d at 207 (quoting U.S.S.G. § 6A1.3(a)); see also United States v. Hooks, 65 F.3d 850, 854 (10th Cir.1995), cert. denied, --- U.S. ----, 116 S.Ct. 797, 133 L.Ed.2d 745 (1996). We review the district court's finding for clear error, and we will reverse only if we are "convinced that the sentencing court's finding is simply not plausible or permissible in light of the entire record on appeal." Torres, 53 F.3d at 1144. Furthermore, "[t]he credibility of a witness whose testimony is relied upon at sentencing is for the sentencing court to analyze." Sloan, 65 F.3d at 865 (citing United States v. Deninno, 29 F.3d 572, 578 (10th Cir.1994), cert. denied, --- U.S. ----, 115 S.Ct. 1117, 130 L.Ed.2d 1081 (1995)).
 
 
 72
 Mr. Norwood, Mr. Hickman, and Ms. Traylor rely on our decisions in United States v. Richards, 27 F.3d 465 (10th Cir.1994), and Ortiz, 993 F.2d 204, for the proposition that the district court's finding that "during the scope of this conspiracy, at least 20 kilograms of crack cocaine were distributed" was clear error, because the estimate it relied on lacked "sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3(a). In Ortiz, we held that out of court statements by unidentified informants, as opposed to identified informants, cannot support a drug estimate unless they are "sufficient[ly] corroborated by other means." Ortiz, 993 F.2d at 207 (citations and internal quotation marks omitted). In that case, we held the defendant's admission he had distributed one-pound quantities of marijuana to two friends every six months and an intercepted telephone call establishing a one-time purchase of one kilogram of marijuana were insufficient to corroborate a confidential informant's out-of-court statement that the defendant distributed three pounds of marijuana per week for eighteen months. Id. at 207-08. In Richards, the in-court testimony of Becky Drake was conflicted with her statement that Ms. Richards distributed eighty grams of heroin. Richards, 27 F.3d at 469. Ms. Drake testified Ms. Richards sometimes sold her one or two grams of heroin per week, but sometimes as much as four or five grams per week. Id. She also testified that DEA agents had essentially "guessed" Ms. Richards had distributed eighty grams of heroin, on the assumption that Ms. Drake purchased five grams per week for sixteen weeks. Id. Because Ms. Drake's own testimony regarding the quantities she purchased from Ms. Richards conflicted with her estimate, and because there was no other evidence to support her estimate, we held her estimate was not sufficiently reliable to support the district court's finding. Id. at 469-70. Richards stands for the proposition that if a witness' estimate conflicts with that witness' own testimony, and there is no other evidence to support the estimate, the estimate will not support a finding. However, Richards does not hold that the district court cannot rely solely on a single witness' estimate where there is no significant conflict between the estimate and the witness' other testimony. See also Hooks, 65 F.3d at 854 (uncorroborated testimony of single witness sufficient despite vagueness and potential bias). The defendants also cite our decision in Roberts, 14 F.3d at 519-21. In that case, one of the defendants, Lee Roberts, admitted during an interview with a law enforcement agent that he had bought and redistributed 150 to 200 pounds of methamphetamine between 1987 and February 1991. Id. at 520. The district court relied on this and other evidence in concluding he was responsible for distributing sixty pounds of methamphetamine between January 1, 1989 and February 26, 1991. Id. None of the witnesses actually testified Mr. Roberts distributed sixty pounds of methamphetamine during the time period alleged in the indictment. Instead, the estimate was an extrapolation based on the 150 to 200 pounds Mr. Roberts admitted he distributed during a different time frame. Id. at 520-21. We held the district court had "ground[ed] its conclusion in midair" because there was no reasonable basis for its decision to extrapolate its finding from the 150 to 200 pounds Mr. Roberts had admitted, and there was not enough additional evidence in the record to allow us to reconstruct the factual basis for the sixty-pound estimate. Id. at 521. Roberts therefore stands for the proposition that if the government estimates X pounds of drugs are attributable to the defendant, but none of the witnesses actually testifies that X pounds of drugs are attributable to the defendant, and the district court bases its finding on the government's estimate and concludes X pounds of drugs are attributable to the defendant, we will reverse the finding unless there is enough evidence in the record to allow us to reconstruct the estimate.
 
 
 73
 Finally, our recent holding in United States v. Nieto, 60 F.3d 1464 (10th Cir.1995), cert. denied, --- U.S. ----, 116 S.Ct. 793, 133 L.Ed.2d 742 (1996), is highly instructive. In that case, the district court relied on the testimony of a single trial witness, Lorenzo Garcia, in finding 210 pounds of marijuana were attributable to Mr. Nieto. Id. at 1469-70. Mr. Garcia testified that Mr. Nieto had helped transport or package three carloads of marijuana containing seventy pounds each, that he had actually seen Mr. Nieto package one of the loads, that the car normally carried seventy pounds of marijuana, and that he had helped package another load that was seventy pounds, all of which testimony the district court found credible. Id. at 1469. In light of the fact the record contained credible, though uncorroborated, testimony from a single, identified witness from which we could reconstruct the district court's estimate, we concluded the district court's finding was not clear error. Id. at 1470. We believe Nieto outlines the ideal, though not necessarily required, method for proving drug quantity: an estimate from a credible, identified witness, plus concrete evidence that the reviewing court can use to reconstruct the factual basis for the estimate. We encourage the government to use this type of proof whenever possible.
 
 
 74
 Contrary to Mr. Norwood's and Ms. Traylor's contention, the evidence in this case was much stronger than the evidence in Ortiz, Roberts, Richards, and Nieto. Ms. Ingram told Agent Hersley that she and Mr. Hickman distributed twenty kilograms of crack cocaine between February 1990 and August 1993, when Mr. Hickman was arrested, and that Mr. Norwood, through Ms. Ivy and Ms. Traylor, distributed an additional thirty kilograms. All this occurred during the period alleged in the indictment. Mr. Nelson, Mr. Davis, Mr. Clay, and Mr. Ingram corroborated Ms. Ingram's estimate of the amount of crack cocaine Mr. Norwood distributed through Ms. Ivy and Ms. Traylor by stating twelve to fifteen individuals sold between one and three ounces of crack cocaine per week for three years. Even without any more evidence, this would be sufficient to show the probable accuracy of Ms. Ingram's thirty-kilogram estimate. However, there is more: contrary to Mr. Norwood and Ms. Traylor's contention, our review of the record reveals ample evidence to corroborate Mr. Nelson's, Mr. Davis', Mr. Clay's, and Mr. Ingram's statements to Agent Hersley. Given that Ms. Ingram's thirty-kilogram estimate bore "sufficient indicia of reliability to support its probable accuracy," U.S.S.G. § 6A1.3(a), the district court's finding her statements to Agent Hersley supported its conclusion that "the scope of this conspiracy included at least 20 kilograms of cocaine base or crack" was by no means clear error. It is therefore unnecessary for us to consider whether Ms. Ingram's twenty-kilogram estimate bore "sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3(a).
 
 
 75
 Mr. Hickman and Ms. Traylor also contend the district court erred when it found twenty kilograms of crack cocaine were attributable to them individually. We disagree. During the sentencing hearing, the district court found "from all the evidence ... that [Ms. Traylor] was intimately involved in the conspiracy and knew the scope of the conspiracy and the range of the conspiracy and was very actively involved during at least three years of it, and that she should be held accountable for the entire 20 kilos of crack cocaine." It also made a similar, though less detailed, finding with respect to Mr. Hickman. This finding clearly states the applicable law, see Roberts, 14 F.3d at 522 ("The drug amount attributable to a defendant for purposes of sentencing is not established merely by looking to the amount of drugs involved in the conspiracy as a whole, [but only to] the quantity of drugs which he reasonably foresaw or which fell within 'the scope' of his particular agreement with the conspirators.") (citation omitted), and, in light of the trial evidence, was not clear error.
 
 B. Role in the Offense
 
 76
 Mr. Hickman contends the district court erred when it increased his offense level three points because he was "a manager or supervisor (but not an organizer or leader)" of a criminal activity that "involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(b). Mr. Hickman's presentence report states that
 
 
 77
 [a]ccording to FBI agents, the defendant dispensed cocaine base to the street-level dealers. They also advise he received a larger share of the profits than most members of the conspiracy. Pursuant to § 3B1.1(b), because he was a manager of a criminal activity that involved five or more participants, three levels are added.
 
 
 78
 Mr. Hickman objected to this statement on the ground "there is insufficient evidence to support that Hickman was a manager within the government's definition." The Probation Department responded by repeating what it wrote in the presentence report and stating it "believes the presentence report, as written, is accurate." The district court overruled Mr. Hickman's objection and found, based on both the evidence introduced at trial and the testimony of Agent Hersley during the sentencing hearing that "there were many more members than five that were actively involved with the defendant as a manager."
 
 
 79
 Mr. Hickman contends the district court's finding was clear error because the evidence showed only that he was a middle man between the leader of the conspiracy, Mr. Norwood, which is insufficient to support the district court's finding. See Roberts, 14 F.3d at 524 (the mere fact that a defendant distributed, delivered, or acted as a source of drugs, without more, "do[es] not constitute evidence of decision-making authority or control over a subordinate necessary to conclude [a defendant] was a supervisor or manager") (emphasis in the original); see also Owens, 70 F.3d at 1128-29 (evidence that an individual fronted crack cocaine to family members for resale to consumers, standing alone, is not sufficient to support a finding he was an "organizer or leader" within the meaning of U.S.S.G. § 3B1.1(a)). Mr. Hickman also contends the fact he and Mr. Norwood are brothers does not support the district court's finding. See Roberts, 14 F.3d at 524 ("By itself, a close personal relationship with the leader or organizer of a conspiracy does not prove [the] defendant acted as a manager or supervisor.... [Instead, the government must show the defendant] acted in a supervisory or managerial capacity independent of any intimate connection with the major player in the criminal activity.") (emphasis in the original). Finally, Mr. Hickman asserts
 
 
 80
 [t]here was no evidence that showed [he] had decision making authority or control over any subordinate street dealer; no evidence that [he] recruited others; no evidence that [he] went to California with Norwood to obtain drugs; no evidence that [he] negotiated the purchase price of drugs; and no evidence that [he] claimed a disproportionate share of the profits.
 
 
 81
 He does not, however, challenge the district court's finding the conspiracy involved five or more participants. The government responds by drawing our attention to evidence showing, inter alia, that Mr. Hickman fronted crack cocaine to a number of street level dealers, including Mr. Taylor, Mr. Davis, Mr. Clay, Richard Ingram, and Flora Ingram, and that he was responsible for collecting the money they owed Mr. Norwood for the crack cocaine after they sold it, and contends the district court could reasonably infer from this evidence that Mr. Hickman "managed" them in their efforts to sell the crack cocaine and thereby make good on their debts.
 
 
 82
 In United States v. Wacker, 72 F.3d 1453 (10th Cir.1995), we held the district court must make specific findings and "advanc[e] a factual basis" to support an enhancement under U.S.S.G. § 3B1.1. Wacker, 72 F.3d at 1477. We explained that "even if the record overwhelmingly supports the enhancement, appellate fact-finding cannot substitute for the district court's duty to articulate clearly the reasons for the enhancement." Id.; see also United States v. Cordoba, 71 F.3d 1543, 1547 (10th Cir.1995); United States v. Pelliere, 57 F.3d 936, 940 (10th Cir.1995) (without specific findings, we are left "to flounder in the zone of speculation") (citation and internal quotation marks omitted); Roberts, 14 F.3d at 522. Here, the district court stated simply that "there were many more members than five that were actively involved with this defendant as a manager." This is inadequate under Wacker. Therefore, in light of Wacker, we must decline to resolve the issues raised by the parties and remand the case to the district court with directions to make specific findings indicating the factual basis for its conclusion Mr. Hickman was a "manager" within the meaning of U.S.S.G. § 3B1.1(b).
 
 C. Acceptance of Responsibility
 
 83
 Mr. Hickman contends the district court erred when it denied his request for a reduction in his offense level for acceptance of responsibility under U.S.S.G. § 3E1.1. To receive such a reduction, the defendant must prove by a preponderance of the evidence that he has "clearly demonstrate[d] acceptance of responsibility for his offense." U.S.S.G. § 3E1.1(a); United States v. Portillo-Valenzuela, 20 F.3d 393, 394 (10th Cir.), cert. denied, --- U.S. ----, 115 S.Ct. 227, 130 L.Ed.2d 152 (1994). Whether the defendant has clearly demonstrated acceptance of responsibility is a factual question we review only for clear error, United States v. McCollom, 12 F.3d 968, 972 (10th Cir.1993), and doing so we remain mindful that "[t]he sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility. For this reason, the determination of the sentencing judge is entitled to great deference on review." U.S.S.G. § 3E1.1, comment. (n. 5).
 
 
 84
 Mr. Hickman's presentence report states that "[t]he adjustment for acceptance of responsibility is not available for this defendant, as he put the government to the burden of proving his guilt at trial." Mr. Hickman objected to this statement on the ground that "the acceptance of responsibility reduction should not be automatically foreclosed by insisting upon a trial." The Probation Department responded by citing, inter alia, U.S.S.G. § 3E1.1, comment. (n. 2), which provides:
 
 
 85
 This adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse. Conviction by trial, however, does not automatically preclude a defendant from consideration for such a reduction. In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to trial. This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (e.g., to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct). In each such instance, however, a determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct.
 
 
 86
 The Probation Department stated it "does not believe one of those rare situations exist in this case and believes the defendant has not shown that he has accepted responsibility for his actions." The district court denied Mr. Hickman's request for reduction in his offense level because it "just [did]n't see any evidence that this defendant has accepted responsibility for his acts as defined by the guidelines."
 
 
 87
 Mr. Hickman now challenges the district court's decision on two grounds. First, he contends certain Tenth Circuit decisions, chiefly Portillo-Valenzuela, 20 F.3d 393, were wrongly decided and should not be applied to his case. In Portillo-Valenzuela, the defendant confessed prior to trial that he had unlawfully entered the United States in violation of 8 U.S.C. § 1326(b)(2), but nevertheless pled not guilty and forced the government to prove factual guilt at trial. Portillo-Valenzuela, 20 F.3d at 394. He did not testify at trial and did not retract his confession. Id. On appeal, he contended the district court committed clear error when it denied his request for a reduction in offense level for acceptance of responsibility. Id. We rejected his contention, and held, inter alia, that a defendant who denies factual guilt and forces the government to prove it at trial is not entitled to a reduction for acceptance of responsibility, "regardless of how easily the government can prove guilt." Id. at 394-95. We also read U.S.S.G. § 3E1.1, comment. (n. 2), as meaning that "in all but rare cases going to trial will preclude reduction for acceptance of responsibility, but in those rare cases acceptance of responsibility will be based upon pretrial statements and conduct rather than post-conviction admissions of guilt and expressions of remorse." Portillo-Valenzuela, 20 F.3d at 395.
 
 
 88
 According to Mr. Hickman, our decision in Portillo-Valenzuela was incorrect because a "plain reading" of U.S.S.G. § 3E1.1, comment. (n. 2), makes it clear a defendant "puts the government to its burden of proof at trial by denying the essential elements of guilt" only if he actually presents evidence denying guilt during trial, and not if he merely enters a plea of not guilty. Because Mr. Hickman introduced no evidence during trial, he contends U.S.S.G. § 3E1.1, comment. (n. 2), does not bar him from receiving a reduction in offense level for acceptance of responsibility. We see a number of flaws in Mr. Hickman's argument, but we will discuss only two we believe are dispositive. First, U.S.S.G. § 3E1.1, comment. (n. 2), makes it clear a defendant who enters a plea of not guilty qualifies for a reduction in offense level for acceptance of responsibility only "[i]n rare situations" such as when "a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (e.g., to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct)." If we were to include all cases in which the defendant does not take the stand or present exculpatory evidence during trial, a very common occurrence, this very narrow exception would swallow the general rule that defendants who puts the government to its burden of proof at trial are not entitled to a reduction for acceptance of responsibility. Second, both U.S.S.G. § 3E1.1(a) and application note 2, make it clear a defendant is entitled to a reduction in offense level for acceptance of responsibility only if he "clearly demonstrates" acceptance of responsibility for his offense. It is disingenuous to maintain that an individual "clearly demonstrates" acceptance of responsibility by simply declining to controvert the government's evidence at trial. Instead, this language contemplates that the defendant will perform some affirmative act, rather than standing idly by while the government proves its case. We therefore reject Mr. Hickman's contention and reaffirm our analysis and conclusion in Portillo-Valenzuela.
 
 
 89
 Second, Mr. Hickman contends the district court's finding he did not "clearly demonstrate acceptance of responsibility" was clear error. He relies on his statements during an interview with the author of his presentence report, in which he
 
 
 90
 admitted he had purchased ounce-lots of crack cocaine on 10 or 11 different occasions from 1991 through 1993. He recalled he would buy the cocaine from different individuals and sell it to "smokers" in the Kerr Village area. He claims that he accepts responsibility for his actions although he states that he knows for a fact that what the government says he did is not true.
 
 
 91
 Mr. Hickman contends that, by virtue of this statement, his case falls into one of the "rare situations" in which a defendant who has denied factual guilt and forced the government to prove its case at trial is nevertheless entitled to a reduction in offense level for acceptance of responsibility. See U.S.S.G. § 3E1.1, comment. (n. 2). We reject Mr. Hickman's contention for two reasons. First, we do not consider his statements to be an acceptance of responsibility, but simply an expression of remorse by one who has chosen to risk entering a plea of not guilty in the hopes the government would not be able to prove its case at trial. Second, Mr. Hickman's statement is, at most, a partial and equivocal acceptance of responsibility, and therefore does not provide a basis for a reduction in offense level under U.S.S.G. § 3E1.1(a). United States v. Young, 45 F.3d 1405, 1416 (10th Cir.), cert. denied, --- U.S. ----, 115 S.Ct. 2633, 132 L.Ed.2d 872 (1995).
 
 D. Criminal History
 
 92
 Ms. Ivy's presentence report assigned her seven criminal history points and placed her in criminal history category IV. With a total offense level of 42, her guideline sentencing range was 360 months to life. U.S.S.G. Chapter 5, Part A. The district court reduced Ms. Ivy's offense level two points because she was a minor participant. U.S.S.G. § 3B1.2(b). The offense level reduction had no effect on her guideline range, because even with a total offense level of 40, the applicable guideline range remained 360 months to life. U.S.S.G. Chapter 5, Part A. The district court sentenced Ms. Ivy to 360 months. Ms. Ivy now contends the district court erred in assigning her one criminal history point pursuant to U.S.S.G. § 4A1.1(c) because she was convicted in Oklahoma State District Court in July 1993 for one count of possession of a controlled substance with intent to distribute and one count of possession of a controlled dangerous substance without a tax stamp. According to Ms. Ivy, these offenses did not amount to a "prior sentence" within the meaning of U.S.S.G. § 4A1.1(c), because they were "part of the instant offense," i.e., the Norwood/Hickman conspiracy, within the meaning of U.S.S.G. § 4A1.2(a)(1). Ms. Ivy acknowledges she did not raise this objection in the district court, which normally precludes review by this court. See United States v. Ciapponi, 77 F.3d 1247, 1252 (10th Cir.1996), ("Clearly, factual disputes bearing on the sentence, which are not raised at sentencing, are waived."); United States v. Saucedo, 950 F.2d 1508, 1518 (10th Cir.1991) ("A factual dispute concerning the applicability of a particular guideline, not brought to the attention of the district court, does not rise to the level of plain error."). "However, we recognize a narrow exception and review a legal question involving application of the sentencing guidelines for plain error." Ciapponi, 77 F.3d at 1252. In order to evoke this exception, "the error must be particularly egregious, as well as obvious and substantial," and we will apply it "solely in those circumstances in which a miscarriage of justice would otherwise result." Saucedo, 950 F.2d at 1511 (citations and internal quotation marks omitted).
 
 
 93
 Because Ms. Ivy was sentenced on April 4, 1994, the district court relied on the version of the sentencing guidelines effective November 1, 1993. U.S.S.G. § 1B1.11(a); Owens, 70 F.3d at 1130. On November 1, 1993, the Sentencing Commission amended U.S.S.G. § 4A1.2, comment. (n. 1), by adding the following: "Conduct that is part of the instant offense means conduct that is relevant conduct to the instant offense under the provisions of § 1B1.3 (Relevant Conduct)." U.S.S.G.App. C, amend. 493. The purpose of the amendment was "to avoid double counting and ensure consistency with other guideline provisions." Id. Prior to this amendment, we had held that prior offenses are "part of the instant offense," if they were not "severable instances of unlawful ... conduct." United States v. Banashefski, 928 F.2d 349, 352 (10th Cir.1991). The government concedes, and we agree, that Ms. Ivy's state drug convictions amount to relevant conduct, see United States v. Williamson, 53 F.3d 1500, 1525-26 (10th Cir.) (state conviction for possession of cocaine in 1990 is relevant conduct where charged offense is conspiracy to distribute crack cocaine between 1986 and 1991), cert. denied, --- U.S. ----, 116 S.Ct. 218, 133 L.Ed.2d 149 (1995), and therefore Ms. Ivy should not have received the point in the criminal history category calculation. It also concedes, and we again agree, that the erroneous inclusion of the criminal history point can amount to plain error under certain circumstances. See Williamson, 53 F.3d at 1525-26. In Williamson, we stated it would be plain error for the district court to increase the defendant's offense level on the grounds her state conviction for possession of cocaine was "relevant conduct" under U.S.S.G. § 1B1.3, and at the same time increase her criminal history score on the basis of that same conviction, the very thing U.S.S.G.App. C, amend. 493, was designed to prevent. Williamson, 53 F.3d at 1526. We held, however, that there was no plain error because it was clear from Ms. Williamson's presentence report that the district court did not consider her state drug conviction as relevant conduct. Id.
 
 
 94
 Ms. Ivy does not contend the district court's error amounted to plain error because it counted her state drug convictions both as relevant conduct and as a prior sentence. In addition, the government points out that if the district court had not considered Ms. Ivy's state drug convictions in calculating her criminal history score, it would have assigned her six criminal history points, which would have placed her in criminal history category III. With an offense level of 40, her guideline sentencing range would have remained 360 months to life. U.S.S.G. Chapter 5, Part A. Because Ms. Ivy received the minimum sentence in this range, the government contends the district court's error was necessarily harmless.
 
 
 95
 According to Ms. Ivy, the government's contention is fatally flawed. The Sentencing Commission amended the drug quantity table, U.S.S.G. § 2D1.1(c), effective November 1, 1994. U.S.S.G.App. C, amend. 505. The Sentencing Commission later issued a policy statement indicating this amendment to U.S.S.G. § 2D1.1(c) applies retroactively to all defendants currently serving terms of imprisonment. U.S.S.G. § 1B1.10(a, c); U.S.S.G.App. C, amend. 536 (November 1, 1995). The district court found that 20 kilograms of crack cocaine were attributable to Ms. Ivy for sentencing purposes, and she does not challenge this finding. This quantity of crack cocaine yielded a base offense level of 42 under the November 1, 1993, version of U.S.S.G. § 2D1.1(c). After subtracting the two-point reduction for minor participation, U.S.S.G. § 3B1.2(b), Ms. Ivy's total offense level was 40. Under the amended version of U.S.S.G. § 2D1.1(c), Ms. Ivy's base offense level would be only 38. After subtracting the two-point reduction for minor participation, her total offense level would be 36.
 
 
 96
 The district court has discretion to reduce Ms. Ivy's base offense level from 40 to 38, either on its own motion or upon a motion by Ms. Ivy, provided such reduction is warranted in light of the factors listed in 18 U.S.C. § 3553(a). 18 U.S.C. § 3582(c)(2); U.S.S.G. § 1B1.10(a); see United States v. Telman, 28 F.3d 94, 96 (10th Cir.1994) (sentence reduction under 18 U.S.C. § 3582(c)(2) "is not mandatory but is committed to the sound discretion of the trial court," but trial court must consider relevant factors listed in 18 U.S.C. § 3553(a)); United States v. Avila, 997 F.2d 767, 768 (10th Cir.1993) (district court's discretion to reduce sentence under 18 U.S.C. § 3582(c)(2) "tethered to the factors contained in § 3553(a)"); see also U.S.S.G. § 1B1.10(b); United States v. Mueller, 27 F.3d 494, 496 (10th Cir.1994) (in deciding whether to reduce a sentence under 18 U.S.C. § 3582(c)(2), the "sentencing court [must] determine[ ] the applicability of the new guideline in the context of the circumstances in existence at the time the sentence was originally imposed," and must consider the sentence it would have imposed had the amended guideline been in effect at the time of sentencing). Ms. Ivy indicates that she plans to file a motion for resentencing on this and other grounds pursuant to 28 U.S.C. § 2255 once her appeal becomes final. Should the district court grant her motion, she contends, the erroneous assignment of one criminal history point for Ms. Ivy's July 1993 drug convictions would by no means be harmless error, because Ms. Ivy's guideline range in criminal history category III with a total offense level of 36 would be 235-293 months as opposed to 262-327 in criminal history category IV. U.S.S.G. Chapter 5, Part A.
 
 
 97
 Ms. Ivy is correct that the district court's error may prove to be a "miscarriage of justice" amounting to plain error, but only if the district court chooses to reduce her offense level. If it does not, her offense level will remain 40, and her guideline range will be 360 months to life in both criminal history category III and IV. We are therefore left in a conundrum. We are loath to hold the district court's error amounted to a miscarriage of justice solely because it may prejudice Ms. Ivy in some yet-to-be-filed collateral challenge to her sentence. At the same time, we believe it would be unjust to hold the district court did not plainly err and affirm, thus greatly reducing the potential benefit Ms. Ivy might receive if she succeeds in her motion for resentencing. There is, however, a third option: to remand her case to the district court with directions to decide whether her offense level should be reduced by two points in light of the amendment to U.S.S.G. § 2D1.1(c), and to instruct the district court that if it concludes such a reduction is appropriate, it must subtract one criminal history point, reduce Ms. Ivy's criminal history category to III, and resentence her accordingly. See United States v. Connell, 960 F.2d 191, 197 n. 10 (1st Cir.1992) ("To be sure, a defendant must ordinarily petition the district court for modification of his sentence under U.S.S.G. § 1B1.10.... In the present posture of this case, however, we see no need to force appellant to take this additional step.") We believe the third option is the best solution to this rather unusual situation.[4]
 
 
 98
 Ms. Ivy also contends the district court erred when it assigned her one criminal history point pursuant to U.S.S.G. § 4A1.1(c) because she was convicted of driving with a suspended license and failure to carry automobile insurance, because the government failed to prove she was sentenced to "a term of probation of at least one year or a term of imprisonment of at least thirty days." U.S.S.G. § 4A1.2(c)(1); see Hooks, 65 F.3d at 854-56. The government concedes the district court failed to make a specific finding whether Ms. Ivy was sentenced to "a term of probation of at least one year or a term of imprisonment of at least thirty days" for these offenses, and asks us to direct the district court to make a finding upon remand. The district court is so instructed.
 
 E. Mandatory Minimum Sentence
 
 99
 Shortly before trial, the government notified Ms. Ivy it intended to seek enhanced mandatory minimum penalties under 21 U.S.C. § 841(b)(1)(A) on the basis of her July 1993 drug convictions. See 21 U.S.C. § 851(a).
 
 
 100
 According to the government, Ms. Ivy's convictions subjected her to a mandatory minimum sentence of twenty years imprisonment, ten years supervised release, and a fine of $8 million. See 21 U.S.C. § 841(b)(1)(A). However, Ms. Ivy's presentence report stated she was subject to a mandatory minimum sentence of ten years imprisonment, five years supervised release, and a discretionary denial of federal benefits for five years, all which would have been the applicable mandatory minima had the government not sought an enhanced penalty. See 21 U.S.C. §§ 841(b)(1)(A) & 862(a)(1)(A). The government did not object to the presentence report. During the sentencing hearing, the district court made no mention of the government's pretrial request for enhancement during the sentencing hearing, and indeed appears to have ignored it given that it imposed only five years supervised release. The district court did, however, deny federal benefits for ten years. After the district court pronounced the sentence, defense counsel said "I believe the report said a five-year denial of benefits. Could the court reconsider the ten years?" The district court asked the probation officer present in the courtroom, "This is one in which ten years is applicable, is it not?" The probation officer responded, "It's ten years because she had one previous conviction for possession with intent," referring to Ms. Ivy's July 1993 state drug convictions. The district court then overruled the objection.
 
 
 101
 Both Ms. Ivy and the government raise a number of arguments regarding the applicability of the enhanced mandatory minima allowed under 21 U.S.C. § 841(b)(1)(A). We need not tarry long on this issue. As noted above, the presentence report took no account of Ms. Ivy's state drug convictions when it calculated the appropriate mandatory minima under 21 U.S.C. § 841(b)(1)(A). The government did not object to the presentence report before or during the sentencing hearing. We have repeatedly held that if a defendant fails to object to his presentence report, he waives his right to challenge the district court's reliance on it, unless the district court's decision to do so amounts to plain error. See, e.g., Saucedo, 950 F.2d at 1518. We see no reason to apply a different rule when the government fails to object. There is nothing novel about this conclusion. In United States v. Hardwell, 80 F.3d 1471 (10th Cir.1996), the government contended on cross-appeal that the district court had erred by failing to convert $40,000 in cash seized from one of the defendants into two kilograms of cocaine for sentencing purposes. Id., 80 F.3d at 1500. The presentence report omitted these two kilograms, but the government objected to the presentence report for the first time during the sentencing hearing. Id. The district court noted the objection, but made no finding the government had shown good cause for failing to object earlier. See Fed.R.Crim.P. 32(b)(6)(D). We acknowledged the government's position was supported by the applicable case law, but held the district court was not required to hear the government's untimely objection and deemed the government's contention waived. Id.
 
 
 102
 Turning to the case before us, it is well established that an error does not amount to plain error unless it is "particularly egregious, as well as obvious and substantial." Saucedo, 950 F.2d at 1511 (citations and internal quotation marks omitted). The district court's decision, if error, was by no means obvious and substantial. We therefore conclude Ms. Ivy is not subject to the twenty-year mandatory minimum sentence under 21 U.S.C. § 841(b)(1)(A), but only the ten-year mandatory minimum sentence prescribed under that statute.
 
 
 103
 We conclude, however, that the district court erred when it imposed a ten-year denial of federal benefits under 21 U.S.C. § 862(a)(1)(B). When the government failed to object to the presentence report, Ms. Ivy was entitled to believe the government had abandoned its effort to obtain enhanced mandatory minimum penalties on the basis of her state drug convictions, and she was therefore entitled to believe there was no need to challenge these penalties. Balancing the government's interest in obtaining the enhanced penalties against Ms. Ivy's interest in receiving unequivocal notice of the government's intent and having a meaningful opportunity to respond, we believe the appropriate remedy is to deem the government's failure to object to the presentence report an abandonment of its effort to obtain enhanced penalties on the basis of Ms. Ivy's state drug convictions.
 
 
 104
 Upon remand, the district court shall reconsider its decision to deny federal benefits. Should the district court again conclude a denial of federal benefits is warranted, such denial shall not last for more than five years. 21 U.S.C. § 862(a)(1)(A).
 
 IV
 
 105
 Ms. Ivy's and Mr. Hickman's cases are REMANDED for resentencing in accordance with this opinion. The defendants' convictions and sentences are AFFIRMED in all other respects.
 
 
 
 *
 After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of these appeals. See Fed.R.App.P. 34(a); 10th Cir. R. 34.1.9. The causes are therefore ordered submitted without oral argument
 
 
 **
 The Honorable Arthur L. Alarcon, United States Circuit Judge for the Ninth Circuit, sitting by designation
 
 
 [1]
 Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)
 
 
 [2]
 We initially appointed Mr. Hickman's trial counsel, John Kline, to represent him on appeal. (CTA Doc. 21.) Shortly thereafter, Mr. Hickman filed a pro se motion to appoint another attorney and to extend the time for filing his opening brief. (CTA Doc. 23.) While Mr. Hickman's motion was pending, Mr. Kline filed an opening brief on Mr. Hickman's behalf. (CTA Doc. 30.) We then granted Mr. Hickman's motion and appointed Mr. Thomas D. McCormick as counsel of record. (CTA Doc. 32.) Mr. McCormick then filed an opening brief of his own, which repeated the contentions in Mr. Kline's brief and raised one additional ground for relief. (CTA Doc. 42.) Because Mr. Hickman himself has made it clear he does not want Mr. Kline to represent him on appeal, Mr. Kline's opening brief is stricken and we will consider only Mr. McCormick's brief
 
 
 [3]
 Nathaniel Washington did not testify during trial
 
 
 [4]
 Of course, Ms. Ivy may still bring a motion for resentencing on other grounds